**REVISED OCTOBER 9, 2014**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 9, 2014

Lyle W. Cayce
Clerk

No. 13-51008

PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH
SERVICES; PLANNED PARENTHOOD CENTER FOR CHOICE;
PLANNED PARENTHOOD SEXUAL HEALTHCARE SERVICES; WHOLE
WOMAN'S HEALTH; AUSTIN WOMEN'S HEALTH CENTER; KILLEEN
WOMEN'S HEALTH CENTER; SOUTHWESTERN WOMEN'S SURGERY
CENTER; WEST SIDE CLINIC, INCORPORATED; ROUTH STREET
WOMEN'S CLINIC; HOUSTON WOMEN'S CLINIC, each on behalf of itself,
its patients and physicians; ALAN BRAID, M.D.; LAMAR ROBINSON, M.D.;
PAMELA J. RICHTER, D.o., each on behalf of themselves and their patients;
PLANNED PARENTHOOD WOMEN'S HEALTH CENTER,

Plaintiffs - Appellees

v.

ATTORNEY GENERAL GREGORY ABBOTT; DAVID LAKEY, M.D.;
MARI ROBINSON, Executive Director of the Texas Medical Board,

Defendants - Appellants

Appeal from the United States District Court
for the Western District of Texas

ON PETITION FOR REHEARING AND REHEARING EN BANC
(Opinion March 27, 2014, 748 F.3d 583)

Before JONES, ELROD, and HAYNES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Petition for Rehearing is DENIED. Judge Dennis dissents from the court's denial of rehearing en banc and his dissent is attached.

The court having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED.

In the en banc poll, 3 judges voted in favor of rehearing (Judges Dennis, Graves, and Costa) and 12 judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Davis, Jones, Smith, Clement, Prado, Owen, Elrod, Southwick, Haynes, and Higginson).

ENTERED FOR THE COURT:

*Edith H. Jones*

UNITED STATES CIRCUIT JUDGE

2

JAMES L. DENNIS, Circuit Judge, dissenting:

I respectfully but emphatically dissent from the court's refusal to rehear this case *en banc*. In upholding Texas's unconstitutional admitting-privileges requirement for abortion providers and medication-abortion restrictions, the panel opinion flouts the Supreme Court's decision in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), by refusing to apply the undue burden standard expressly required by *Casey*. Instead, the panel applied what effectively amounts to a rational-basis test—a standard rejected by *Casey*—under the guise of applying the undue burden standard. The panel's assertion that it applies *Casey* is false because it does not assess the strength of the state's justifications for the restrictive abortion laws or weigh them against the obstacles the laws place in the path of women seeking abortions, as required by *Casey*. A correct application of the *Casey* undue burden standard would require that the admitting-privileges provision and medication-abortion restrictions be stricken as undue burdens because the significant obstacles those legal restrictions place in the way of women's rights to previability abortions clearly outweigh the strength of their purported justifications.

If not overruled, the panel's sham undue burden test will continue to exert its precedential force in courts' review of challenges to similar types of recently minted abortion restrictions in Texas, Louisiana, and Mississippi. *See Jackson Women's Health Org. v. Currier,* 760 F.3d 448 (5th Cir. 2014); *Whole Woman's Health v. Lakey*, No. 1:14-CV-284-LY, 2014 WL 4346480 (W.D. Tex. Aug. 29, 2014); *June Med. Servs., LLC v. Caldwell,* No. 3:14-CV-525-JWD-RLB, 2014 WL 4296679 (M.D. La. Aug. 31, 2014). Moreover, the panel opinion

deepens a circuit split,[1] and has been criticized by other federal courts. *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014) ("We conclude that *Abbott* . . . [is] inconsistent with the undue burden test as articulated and applied in [the relevant Supreme Court case law.]"); *see also Planned Parenthood Se. Inc., v. Strange*, No. 2:13-CV-405-MHT (WO), 2014 WL 1320158, at *9-10 (M.D. Ala. Mar. 31, 2014) (hereinafter "*Strange I*") (criticizing *Abbott* panel's application of the *Casey* undue burden test). In disclaiming its duty to correct the panel's perversion of the undue burden standard, a majority of this court effectively ensures that laws, like the Texas law challenged here, that substantially chop away at a woman's right to a previability abortion, will be given only a modicum of scrutiny, essentially giving states *carte blanche* with respect to the regulation of the right to an abortion. This court's abject deference to state authority annihilates any "real substance" to the vital individual constitutional interest at stake: "the urgent claims of the woman to retain the ultimate control over her destiny and her body, claims implicit in the meaning of liberty." *Casey*, 505 U.S. at 869.

\* \* \*

In *Casey*, the Supreme Court of the United States reaffirmed the right announced in *Roe v. Wade*, 410 U.S. 113 (1973)—"the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." 505 U.S. at 846 (plurality opinion). The *Casey* Court simultaneously recognized and endorsed "the principle that the State

---

[1] *See Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013) (upholding a preliminary injunction of a nearly identical admitting-privileges provision); *Planned Parenthood Ariz., Inc., et al, v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014) (holding that the Arizona law restricting the provision of medication that induces abortion is likely unconstitutional).

has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." *Id.* A controlling plurality of the Court, striking a balance between the state's legitimate interests and a woman's constitutionally protected liberty interest, announced that a State regulation goes too far in pursuing its legitimate interests when it imposes an "undue burden" on a woman's ability to choose an abortion. *Id.* at 874 (joint opinion of O'Connor, Kennedy, and Souter, JJ.).

All federal courts are obliged to apply the principles and governing standard announced in *Casey* to determine the constitutionality of a state law challenged as imposing an undue burden on the woman's ability to choose to procure an abortion. We must perform this duty in order to give "real substance to the woman's liberty," *id.* at 869, while at the same time fully honoring the State's ability to pursue, in good faith, its own acknowledged legitimate interests.

On July 18, 2013, the Governor of Texas signed into law House Bill 2 ("H.B. 2"), which contains several provisions regulating abortions. Among its provisions, H.B. 2 requires that all doctors who provide abortions must have admitting privileges at a hospital within 30 miles of where each abortion is performed. *See* TEX. HEALTH & SAFETY CODE § 171.0031(a)(1). On September 27, 2013, the Plaintiffs filed this lawsuit in the United States District Court for the Western District of Texas against the Attorney General of Texas, Gregory Abbott, and others, challenging the constitutionality of, *inter alia*, H.B. 2's admitting-privileges requirement. After a bench trial, the district court held that the admitting-privileges requirement is unconstitutional and enjoined its enforcement. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,* 951 F. Supp. 2d 891, (W.D. Tex. 2013). A motions panel of this

5

court stayed the decision pending appeal, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,* 734 F.3d 406 (5th Cir. 2013) ("*Abbott I*"), and a merits panel reversed and rendered judgment for the State of Texas, except that "the admitting privileges requirement, . . . may not be enforced against abortion providers who timely applied for such privileges under the statute but are awaiting a response from a hospital." 748 F.3d 583, 695 (5th Cir. 2014) ("*Abbott II*").

The *Abbott II* panel decision conflicts with the Supreme Court's decision in *Casey* in various ways. This dissenting opinion will be limited to a discussion of *Abbott II*'s analysis and conclusions regarding H.B. 2's admitting-privileges provision because it is within that portion of the panel decision where the panel most egregiously errs in its application of *Casey*.[2] Specifically,

---

[2] The district court also enjoined H.B. 2's ban on medication-induced abortion performed after 49 days of pregnancy as applied to a woman for whom a physician, in his or her sound medical opinion, determines that a medication abortion between 50 and 63 days from the woman's last menstrual period ("LMP") is necessary to preserve her health or life. The *Abbott II* panel reversed this ruling. As noted herein, this dissenting opinion will be focused primarily on a discussion of H.B. 2's admitting-privileges provision. That being said, I believe the panel's decision upholding H.B. 2's medication-abortion provision is constitutionally invalid for the reasons briefly outlined in this footnote.

First, the *Abbott II* panel characterized the Plaintiffs' challenge as a purely facial challenge, when Plaintiffs in fact brought *both* a facial challenge and a pre-enforcement, as-applied challenge to the medication-abortion provision. As the Plaintiffs contend in their petition for rehearing *en banc*, their initial complaint asked the district court to (1) enjoin the medication abortion restriction as a whole [*i.e.*, facially] and, alternatively, (2) enjoin the restriction "*as applied* to women with gestational ages greater than 49 days LMP for whom a medication abortion is necessary, in their doctor's appropriate medical judgment, to protect their lives or health." (emphasis added). The district court rejected Plaintiffs' facial challenge and granted Plaintiffs partial relief, finding that, as applied to women for whom surgical abortion is a significant health risk, the law imposes an undue burden. *Abbott*, 951 F. Supp. 2d, at 907. The *Abbott II* panel inexplicably characterized this partial, as-applied injunction as a facial remedy, and rejected it largely on that basis. *Abbott II*, 748 F.3d at 604 ("[W]e conclude that H.B. 2's regulations on medication abortion, like the Act in *Gonzales*, do not *facially require* a court-imposed exception for the life and health of the woman . . . . H.B. 2 *on its face* does not impose an undue burden on the life and health of a woman, and the district court erred in finding to the contrary.") (emphasis added). The fact that Plaintiffs'

challenge was brought pre-enforcement does not render it purely "facial" and therefore an improper means to challenge the regulation's health exceptions, or lack thereof. Rather, *Gonzales* affirmed the availability of *pre-enforcement* as-applied challenges. *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007) ("*[P]reenforcement* as-applied challenges to the Act can be maintained") (emphasis added). A pre-enforcement, as-applied challenge is just what was brought here, and the district court, rejecting the facial challenge, properly granted the Plaintiffs the alternative remedy they requested.

Further, the *Gonzales* Court was asked to invalidate the Act at issue *in its entirety*—a "facial" remedy—because the provision lacked a health exception. *Gonzales*, 550 U.S. at 166-67 ("The Act is not invalid on its face where there is uncertainty over whether the barred procedure is ever necessary to preserve a woman's health . . ."). Unlike the Court in *Gonzales*, the *Abbott II* panel was asked to determine whether the district court erred in enjoining the medication abortion restrictions *as-applied* to a certain group of women—the *Abbott II* panel was never tasked with determining whether the lack of a health exception for this class of women should invalidate the provision *in toto*. Thus this language from the *Gonzales* Court that the *Abbott II* panel cited to is not directly applicable. The *Abbott II* panel misconstrued *Gonzales* when it wholesale rejected Plaintiffs' challenge to the medication-abortion restrictions because it was, in part, a facial challenge.

Even if we were to construe the Plaintiffs' challenge to H.B. 2's medication abortion restrictions as a purely facial challenge, the *Abbott II* panel's conclusion here was nonetheless erroneous. First, the Supreme Court has recently explained that "the distinction between facial and as-applied challenges" has no "automatic effect" on the "pleadings and disposition" of a case. *Citizens United v. FEC*, 558 U.S. 310, 331 (2010); *see also* Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 CAL. L. REV. 915, 935 (2011) ("Powerful evidence that the Supreme Court routinely entertains, and not infrequently upholds, facial challenges emerges from examination of the leading cases under a broad range of constitutional provisions . . . . A survey of leading cases unmistakably demonstrates that the Court has held statutes wholly invalid under nearly every provision of the Constitution under which it has adjudicated challenges to statutes."). Accordingly, rejecting the Plaintiffs' challenge because it is a "facial" challenge does not comport with the Court's instruction that the distinction between facial and as-applied should not mandate a particular result.

Moreover, and critically, H.B. 2 contains an express severability provision, clearly indicating the Texas legislature's intent to allow courts to construct narrowly-drawn remedies that preserve as much of the law that complies with the constitution. *See* 2013 Tex. Sess. Law Serv. 2nd Called Sess. Ch. 1 (H.B. 2), Section 1(b) ("The legislature intends that every application of this statute to every individual woman shall be severable from each other."). Here, the district court, in accordance with the severability provision, enjoined the law only to the extent that it imposed a substantial obstacle upon a certain, defined group of women. In so doing, the district court crafted a narrowly drawn remedy, after making findings of fact that are substantially supported by the record. Specifically, the district court made a finding of fact that "there are certain situations where medication abortion is the only safe and medically sound option for women with particular physical abnormalities or preexisting conditions." *Abbott*, 951 F. Supp. 2d, at 907 (footnote detailing these medical conditions omitted). This finding is adequately supported by the record evidence, survives clear error review, and therefore must be upheld by this court. This finding also supports

7

this dissent will focus on three main points of error, any one of which warrants *en banc* consideration or correction by the Supreme Court. First, the *Abbott* panel failed to weigh the magnitude of the burden that the admitting-privileges requirement places on a woman's right to abortion against the strength of the State's justification for the law, in order to determine whether the State's justifications are robust enough to warrant the restriction and corollary burdens. As will be explained *infra*, this weighing of burdens and justifications constitutes the very heart of the inquiry into whether a burden is "undue" within the meaning of *Casey*, and the *Abbott II* panel's patent failure to conduct this inquiry necessitates *en banc* review. Second, the panel misinterpreted and misapplied *Casey*'s "large fraction" test by disregarding the effect of the law in light of the relevant context and circumstances faced by the women for whom the law is relevant (*i.e.* for whom it actually burdens). Finally, it is also necessary to reconsider the panel decision *en banc* because, although purporting to apply clear error review, as required by Supreme Court and circuit precedents, the panel improperly reviewed the district court's factual findings *de novo*, and thereby erroneously substituted the panel's own fact finding for that of the district court. In other words, the panel opinion is based on both erroneous legal precepts and improper *de novo* appellate court

---

the district court's legal conclusion that, as applied to this subset of women with certain physical conditions, H.B. 2's medication-abortion restrictions impose an undue burden because it functions as a "total method ban after 49 days LMP." *Id.* at 908. Thus, even if we construe the Plaintiffs' challenge as purely facial, the district court properly applied the severability clause to construct the narrow, as-applied remedy. *See* Gillian E. Metzger, *Facial and As-Applied Challenges Under the Roberts Court*, 26 FORDHAM URB. L. J. 773, 791 (June 2009) ("severability means that a facial challenge need not lead to facial invalidation"). In sum, the *Abbott II* panel not only failed to apply the clear error standard of review to the district court's findings of fact that support the as-applied injunction, but it also misinterpreted and improperly broadened the meaning of *Gonzales* when it reversed the district court's partial injunction as an improper facial remedy.

factual findings. The *Abbott II* panel's serious constitutional errors in misapplying the *Casey* undue burden standard to the admitting-privileges requirement and its erroneous substitution of its factual findings for the district court's are more than sufficient reason for an *en banc* rehearing.

## I. *Casey*'s Undue Burden Standard

In *Casey,* the Court reaffirmed the "central right" established in *Roe v. Wade*, 410 U.S. 113 (1973)—that a "State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879. As the Court explained, "[t]he woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce." *Id.* at 871. While approving of *Roe*'s central premises, the controlling *Casey* plurality rejected a strict-scrutiny standard of review that cases following *Roe* had adopted and applied to challenges to abortion regulations, *id.* at 871-72, and for which Justice Blackmun argued in his partial dissent, *id.* at 926 (Blackmun, J.) (urging the court to apply strict scrutiny to a State's abortion restrictions). The *Casey* plurality likewise rejected mere rational-basis review—the standard urged by Chief Justice Rehnquist in dissent. *Id.* at 966 (Rehnquist, C.J.). The controlling *Casey* plurality read *Roe* as acknowledging both the importance of a woman's right to make the ultimate decision of whether to terminate her pregnancy previability, as well as the State's legitimate interests in protecting fetal life and preserving the health of the pregnant woman. *Id.* at 872. In light of these competing interests, and in an effort to strike a balance between them, the *Casey* plurality announced the undue burden standard, which functions as a reconciliatory standard between

strict scrutiny and rational-basis review. *See Casey,* 505 U.S. at 878 ("To protect the central right recognized by *Roe v. Wade* while at the same time accommodating the State's profound interest in potential life, we will employ the undue burden analysis."). As the Court has emphasized, the undue burden test "struck a balance. The balance was central" to the *Casey* Court's holding. *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007).

*Casey* thus adopted a compromise position, between the strict-scrutiny review endorsed by Justice Blackmun and the rational-basis review urged by Chief Justice Rehnquist. However, the *Casey* plurality did not adopt ordinary, intermediate scrutiny.[3] Rather than apply one of the recognized tiers of scrutiny, the Court adopted the undue burden test, and in so doing, pointed to two ballot-access cases—namely *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Norman v. Reed*, 502 U.S. 279 (1992)—that similarly applied a standard of review that does not squarely fit into the established tiers of scrutiny. *Casey*, 505 U.S. at 873–74. The ballot access cases apply a flexible balancing test that provides the State with leeway to regulate for a valid purpose, where such regulation does not unnecessarily infringe upon individuals' voting rights. *Id.* The Court explained that the "abortion right is similar" in that courts must weigh the individual woman's right against the State's legitimate interests. *Id.* Therefore, we may look to the ballot access cases for guidance on how to apply the undue burden standard. *See id.; see also Strange I*, 2014 WL 1320158, at *9-10 (discussing the *Casey*'s Court's reference to the ballot-access cases as indicative that the ordinary tiers of scrutiny do not apply to the undue

---

[3] For an example of traditional intermediate scrutiny, *see, e.g.*, *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980) (applying intermediate scrutiny to a gender discrimination claim, requiring that a law be "substantially related" to the achievement of "important governmental objectives").

burden standard announced in *Casey* but rather, "slight burdens may merit slight scrutiny, while heavy burdens warrant heavy scrutiny");[4] *cf. Okpalobi v. Foster*, 190 F.3d 337, 354-55 (5th Cir. 1999), *vacated on other grounds on reh'g en banc*, 244 F.3d 405 (5th Cir. 2001) (explaining that we are not without guidance to apply the undue burden test's purpose analysis, because a similar inquiry is mandated in, for example, voting rights cases).

*Anderson* and *Norman* apply a fluid balancing test that does not function as a "'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789. Rather,

---

[4] In the final order in the *Strange* case, *see Planned Parenthood Se., Inc. v. Strange*, No. 2:13-CV-405-MHT, 2014 WL 3809403 (M.D. Ala. Aug. 4, 2014) (hereinafter "*Strange II*"), Judge Thompson further noted that *Roe v. Wade*'s companion case, *Doe v. Bolton*, 410 U.S. 179 (1973) was cited approvingly in *Casey, see* 505 U.S. at 874-5, and thus provides further evidence that the *Casey* undue burden standard requires a balancing of the strength of the State's justifications against the extent of the burden imposed upon women. *Strange II*, 2014 WL 3809403, at *8-9. Specifically, in *Doe*, the Court reviewed a challenge to a Georgia regulation that required, *inter alia*, that all abortions be conducted in hospitals, rather than at clinics. In concluding that the law was unconstitutional, the Court considered

> the burdens that such a clinic ban would impose on women seeking abortions, [and thus] demanded from the State an honest accounting of the health benefits of the hospital-only requirement. The Court ultimately struck down the requirement, finding that the persuasive "mass of data" offered by the plaintiffs and amici, tended to show that clinics with appropriate staff and facilities were "entirely adequate to perform abortions," while Georgia failed to offer "persuasive data to show that only hospitals meet its acknowledged interest in insuring the quality of the operation and the full protection of the patient." *Doe*, 410 U.S. at 195. Thus, despite acknowledging the State's legitimate interest in protecting women's health, the Court carefully considered the evidence on the degree to which the hospital regulation would actually advance that interest.

*Strange II*, 2014 WL 3809403, at *8. Unlike the *Abbott II* panel, the Court in *Doe* "required more than general statements of concern and claims that the regulations conceivably might, in some cases, lead to better health outcomes; rather, the Court required the State to establish, through evidence, that the regulation was strongly justified." *Id.* at *9.

a court must first consider the *character* and *magnitude* of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the *legitimacy and strength of each of those interests*; it also *must consider the extent to which those interests make it necessary to burden the plaintiff's rights*. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* (emphasis added). The *Casey* plurality's comparison to *Anderson* and *Norman* as it explained the competing interests at stake in challenges to abortion regulations reveals that, like the standard the Court applied in the ballot-access cases, the undue burden test requires a court to consider the "character and magnitude of the asserted injury," *Anderson*, 460 U.S. at 789, and determine whether the "corresponding interest [is] sufficiently weighty to justify the limitation," *Norman*, 502 U.S. at 288–89. Thus, the undue burden test necessarily contains a proportionality principle: if a regulation has the effect of imposing a particularly severe obstacle upon a woman's right to an abortion, then the government's justification must be correspondingly strong. *See, e.g.*, *Casey*, 505 U.S. at 874, 901; *Anderson*, 460 U.S. at 789; *see also Strange I,* 2014 WL 1320158, at *13; *Van Hollen*, 738 F.3d at 798 ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous.").

The *Casey* Court adopted this flexible undue burden test, seeking to balance the competing interests inherent in every challenge to an abortion regulation. In so doing, the Court explained that "an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. The undue burden test thus requires that we determine: (1) whether the statute has a purpose of placing a substantial obstacle in the path of a woman seeking an abortion, and (2) even if the purpose of the regulation is for a valid state interest, whether the law has such an effect. *Id.* If the state's law has either the purpose or effect of placing a substantial obstacle in the path of a woman's choice to obtain a previability abortion, it "cannot be considered a permissible means of serving its legitimate ends." *Id.* To determine whether the regulation has the effect of creating a substantial obstacle to a woman's right to a previability abortion, courts must look to whether the law imposes an undue burden upon a "large fraction of the cases in which [the regulation] is relevant." *Id.* at 895. As explained more fully *infra*, this inquiry requires weighing the magnitude of the burden imposed against the extent and strength of the State's justification for the law. *See, e.g.*, *Casey*, 505 U.S. at 900-01 (balancing the State's legitimate interest in collecting patient information—which the Court deemed a "vital element of medical research"—against the only "slight" increase in cost of abortions, and therefore upholding the challenged recordkeeping and reporting requirements).

Applying this undue burden standard to the challenged provisions of the Commonwealth of Pennsylvania's Abortion Control Act of 1982,[5] the *Casey* Court facially invalidated one provision of the Act—the spousal notification regulation, which required married women to seek consent from their husbands before obtaining an abortion. *Casey*, 505 U.S. at 887-88. The Commonwealth attempted to defend the spousal notification provision by contending that it did not impose a substantial obstacle upon a large fraction of women seeking abortions. *Id.* at 894. Specifically, the Commonwealth argued that eighty percent of women seeking abortions are not married and, of the married women seeking abortions, about 95 percent chose to notify their husbands of the procedure. *Id.* Therefore, the Commonwealth reasoned, only approximately one percent of women—a small fraction of women seeking abortions—would be burdened by the regulation. *Id.* The *Casey* Court rejected this argument and explained that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894. "The analysis does not end with the one percent of

---

[5] The challenged provisions of the Act were summarized by the Court as follows:

> The Act requires that a woman seeking an abortion give her informed consent prior to the abortion procedure, and specifies that she be provided with certain information at least 24 hours before the abortion is performed. For a minor to obtain an abortion, the Act requires the informed consent of one of her parents, but provides for a judicial bypass option if the minor does not wish to or cannot obtain a parent's consent. Another provision of the Act requires that, unless certain exceptions apply, a married woman seeking an abortion must sign a statement indicating that she has notified her husband of her intended abortion. § 3209. The Act exempts compliance with these three requirements in the event of a "medical emergency," which is defined in § 3203 of the Act. In addition to the above provisions regulating the performance of abortions, the Act imposes certain reporting requirements on facilities that provide abortion services.

*Id.* at 844 (citations omitted).

women upon whom the statute operates; it begins there." *Id.* The Court held that the spousal notification regulation had the effect of imposing a substantial obstacle upon a large fraction of women because *within the one percent of women,* there was a "significant number of women" for whom the provision functioned as a restriction because they "fear for their safety and the safety of their children [and] are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases." *Id.* (emphasis added). In drawing this conclusion, the Court considered the effect of the provision in light of the particular, real-world circumstances of the women "most affected by this law." *Id.* at 897 (explaining that an effect of the spousal notification provision is that women who "most reasonably fear the consequences of notifying their husbands that they are pregnant [ ] are in the gravest danger").

Subsequently, in *Gonzales v. Carhart*, the Supreme Court applied *Casey* to review a challenge to the Partial-Birth Abortion Ban Act of 2003, which prohibited a particular form of surgical abortion, known as "intact dilation and extraction" or "intact D & E," a procedure performed in the second trimester of pregnancy that is a variation on another surgical abortion procedure, referred to as D & E. 550 U.S. at 135-36. *Gonzales* applied *Casey*'s undue burden test— addressing first the purpose of the Act and then its effect, considering both the State's legitimate interests and the extent of the Act's infringement upon a woman's right to procure a previability abortion. First, the Court analyzed the purpose of the Act and concluded that it actually furthered the State's legitimate interests in protecting fetal life and thus satisfied the first prong of the *Casey* undue burden analysis. Next, the Court analyzed the effect, observing that the Act's "furtherance of legitimate government interests bears

upon," but is not dispositive of, whether the Act has the effect of placing a substantial obstacle on women. *Id.* at 161. The Court concluded that because there are safe, alternative means for women to exercise their right to choose to terminate a pregnancy previability, Congress' ban on a single procedure did not have an effect of placing a substantial obstacle in the way of a woman's right to obtain an abortion. *Id.* at 164. On balance, in light of the fact that the Act actually advanced the government's legitimate objectives, and that it did not place a substantial obstacle in the path of a woman seeking to procure a previability abortion, the Court upheld the Act as constitutional against Plaintiffs' challenge. *Id.* at 166-67. *Gonzales* thus applied *Casey*'s two-part balancing test and did not introduce any additional aspects to the undue burden standard. *See id.* at 168-69 (Thomas, J., concurring, joined by Scalia, J.) (noting that he concurs in the opinion "because it accurately applies" *Casey*).

Accordingly, this court is obliged to subject the challenged provisions of H.B. 2 to *Casey*'s undue burden balancing test. We must inquire as to whether the law has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion. *Casey*, 505 U.S. at 877. Pursuant to *Casey*, we begin the "effects" analysis by considering the real-life situation of the women who are actually affected by the regulation and ask whether, given these women's circumstances and the particular context in which the law is enacted, a substantial obstacle is placed in the way of a large fraction of these women whose liberty rights are actually restricted by the law. *See id.* at 894-97. In so doing, we must look to the specific group of women for whom the provision in question is relevant (*i.e.*, for whom it is a restriction), and determine if the law places a substantial obstacle in the way of a large fraction *of those women*. We must consider these women's circumstances—for example, whether they are

impoverished or are prevented by some other relevant social factor, such as local hostility and aggression towards abortion clinics and providers—in combination with the direct effects of the admitting-privileges requirement, in order to determine the extent of the burden that results from the regulation. *See id.* at 897 (considering the particular circumstances of women in abusive relationships). To determine whether the obstacle or burden is *undue*, we must analyze the strength of the state's justifications for the law and weigh it against the magnitude of the burden imposed upon a woman's liberty interest. *Id.* at 847, 900-01; *see also id.* at 882-83 (weighing the State's legitimate interest in "protecting the life of the unborn by . . . ensuring a decision that is mature and informed" with the slight burden imposed by requiring physicians to provide women with literature regarding the "consequences to the fetus").

Before addressing the ways in which the *Abbott II* panel misread the Supreme Court precedent and neglected to adhere to the *Casey* undue burden test, I will review the district courts' findings of fact that support its legal conclusions that H.B. 2's admitting-privileges provision imposes substantial obstacles and that the State's justifications for the provision are weak or nonexistent, and the wealth of record evidence that supports each of the district court's findings.

## II. Factual Findings and Record Evidence Supporting the District Court's Opinion

In the district court, the parties presented competing evidence on both sides of the undue burden test. After careful consideration of the live testimony offered by the Plaintiffs, as well as each side's sworn declarations, the district court made various findings of fact with regard to the extent of the obstacles imposed by the admitting-privileges provision and the questionable justifications for the provision in light of the record evidence. Specifically, with

17

regard to the obstacles imposed by the admitting-privileges provision, the court found that: (1) as a result of the admitting-privileges provision, abortion clinics would close, *Abbott*, 951 F. Supp. 2d at 900; (2) the "Rio Grande Valley would be left with no abortion provider because those providers do not have admitting privileges and are unlikely to get them," *id.*; (3) each hospital's bylaws are unique, requiring a variety of prerequisites, some of which abortion providers will be "unable to ever meet," *id.* at 900-01; and (4) finding physicians for hire with active admitting privileges is "difficult because physicians' contracts often bar them from providing 'moonlight' services as abortion providers," and because physicians are "concerned about negative impact on their private practice . . . either financially or as a result of attention from anti-abortion protestors," *id.* at 901. With regard to the State's justifications for the admitting-privileges provisions, the court found that a lack of admitting privileges on the part of an abortion provider "make[s] no difference" in the quality or timeliness of care received by an abortion patient in an emergency room, nor does it improve communication between abortion providers and emergency room physicians, *id.* at 899-900. The district court considered the State's evidence in support of the law and concluded that it was too slight to justify the severe obstacles imposed by the admitting-privileges requirement on a woman's right to obtain an abortion.

We are obliged to review the district court's findings of fact for clear error. *See, e.g.*, *Okpalobi*, 190 F.3d at 342, 357 (reviewing a challenge to an abortion regulation and applying the clear error standard of review to the district court's factual findings); *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) ("[T]he district court's findings of fact are subject to a clearly-erroneous standard of review."). Accordingly, when analyzing the

district court's factual findings, we ask whether they are "plausible in light of the record as a whole." *Rivera v. Quarterman*, 505 F.3d 349, 360 (5th Cir. 2007). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573-74 (1985) (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)).

As discussed at length below, each of the five major findings by the district court is substantially supported by the record evidence and, consequently, is not clearly erroneous. Thus, the *Abbott II* panel's reversal of these findings contravenes Supreme Court and Fifth Circuit precedent mandating clear error review.

### A. Obstacles

On the obstacle side, the parties disagreed as to what effect the admitting-privileges requirement would have on current and potential abortion providers and what effect the elimination of abortion services in various counties of Texas would have on women seeking abortion. The Plaintiffs argued that the admitting-privileges requirement would pose a substantial obstacle because few, if any, of the doctors who provide abortions at their clinics will be able to secure the privileges required by the law and very few, in any, other doctors who have or could secure admitting privileges will begin performing abortions, either at the Plaintiffs' clinics or in other settings within the state. As a result, one third of the abortion clinics in Texas will close, leaving abortion providers in only seven counties of Texas—the counties containing the major urban centers—and leaving many impoverished and

rural areas, for example, the Rio Grande Valley, without any abortion providers. The Plaintiffs presented evidence that, as a result of the closure of approximately one third of Texas abortion clinics and the remaining clinics' inability to meet the inevitably increased demand, approximately 22,000 women per year will be precluded from accessing abortion services in Texas.

The State asserted that the obstacles for women would be minor and that the Plaintiffs' doctors may be able to secure privileges that satisfy the law and that, if they are unable to, other doctors would take their places. The State further contended that, even if the admitting-privileges requirement renders abortions unavailable in some areas of Texas, women seeking abortion would experience only minimal obstacles or inconveniences that do not rise to the level of substantial obstacles. The district court rejected the State's argument and concluded that clinics will close; the Rio Grande Valley will be without an abortion provider; current abortion providers will be unable to obtain the requisite admitting privileges; and it will be difficult or impracticable to secure new doctors to provide abortions at the closed clinics in Texas. As illustrated by the following summary of record evidence, the *Abbott II* panel erroneously disregarded the district court's findings of facts and substituted its own *de novo* findings, although each of the district court's factual findings are substantially supported by the record evidence.

### 1. The Closure of Abortion Clinics

Plaintiffs presented the findings of Joseph Potter, Ph.D., who is an Associate Professor of Demography at the Harvard School of Public Health, a Professor of Sociology at the University of Texas, Austin, earned a Ph.D. from Princeton University in economics, and is the principal investigator for the Texas Policy Evaluation Project. Potter was certified by the court as an expert in demography, and testified to his expert opinions in this regard, and not

merely as a "sociology professor"—as the *Abbott II* panel characterized him. *See Abbott II*, 748 F.3d at 591. Potter, after conducting a survey of data available from 2011 until the present and investigating, *inter alia*, the current status of abortion providers' admitting privileges,[6] concluded that the admitting-privileges provision will result in the loss of abortion clinics in six Texas counties—Bell, Cameron, Hidalgo, Lubbock, McLennen, and Tarrant— and that only seven counties in all of Texas will be left with an abortion provider. Based on Potter's research, analysis, and calculations, he concluded that, if H.B. 2 goes into effect, at least a third of the clinics in Texas will close, and as a result, over 22,000 women annually will not be able to access abortion services.[7]

---

[6] The *Abbott II* panel criticizes Potter's evidence as unscientific and biased because he obtained his evidence from interested parties, including some of the named Plaintiffs. The *Abbott II* panel misrepresented Potter's statement that, because he relied on information provided from abortion providers and other interested parties, "there is no science there." *Abbott II*, 748 F.3d at 593. The *Abbott II* panel cited this testimony to suggest that Potter concedes that his evidence is unreliable, when in actuality, Potter stated, "[t]here's no science there. *It's just evidence*." (emphasis added). Potter appears not to concede anything, but to simply acknowledge that in the field of demography, a social science, an expert's calculations and conclusions are based on evidence obtained from affected individuals. Such methodologies are the regular and accepted practice in demographic research, and, as explained by Potter, are "consistent with the most rigorous and highest standards of demography to rely on that kind of factual information."

[7] The *Abbott II* panel cited one of the State's experts, Dr. Uhlenberg's, attestation that any remaining clinics would perform more abortions as the demand increased, purportedly casting doubt upon Potter's conclusion that over 22,000 women would be unable to access abortion services in Texas after H.B. 2 is implemented. Uhlenberg's declaration, however, ignores Potter's explanation of his finding that, in addition to an increase in demand, enactment of the admitting-privileges provision would simultaneously result in a decrease in capacity among abortion facilities that manage to remain open in Texas. Potter's declaration and testimony not only established a detailed account of the increased demand, but a corollary decrease in capacity, and a resulting inability of women to promptly access abortion treatment. Uhlenberg's affidavit in no way renders the district court's finding that clinics will close clearly erroneous.

The Plaintiffs' other evidence corroborated Dr. Potter's findings. For example, Dr. Paul Fine testified that his organization's Fort Worth surgery center will have to stop providing abortion services because all of the providers who reside in Dallas will be unable to obtain admitting privileges at the Fort Worth hospital. Amy Hagstrom-Miller, the Founder and CEO of Whole Woman's Health ("WWH"), likewise testified that, in Fort Worth, the WWH facility—which accounts for one third of the abortion providers in the Fort Worth area—will close because the facility does not employ any physicians with local admitting-privileges. Dr. Fine further testified that, in West Texas (specifically, in Lubbock County and the city of Waco), all of the current providers travel from hundreds of miles away to provide abortion services and thus will be ineligible for admitting privileges at local hospitals. Additionally, Darrel Jordan, M.D., the Chief Medical Officer of Planned Parenthood of Greater Texas ("PPGT"), attested via sworn affidavit that, if the admitting-privileges provision takes effect, three of the four clinics that PPGT owns—namely, clinics providing abortion services in Austin, Fort Worth, and Waco—will close. From this evidence, the district court plausibly found that clinics throughout Texas will close.

The *Abbott II* panel criticized the district court for its "vague" and "imprecise" findings. *Abbott II*, 748 F.3d at 597. However, perfect precision is not what is required to satisfy clear error review. The district court's finding, while not specific or detailed, is adequately supported by the record evidence, plausible in light of the evidence taken as a whole, and thus not clearly erroneous. *Rivera*, 505 F.3d at 360; *see also Voting for America, Inc.*, 732 F.3d at 386.

## 2. Rio Grande Valley Will be Without an Abortion Clinic

The district court found that all "24 counties in the Rio Grande Valley [will] be left with no abortion provider." *Abbott*, 951 F. Supp. 2d at 900. The *Abbott II* panel concluded that this finding of fact was clearly erroneous for two reasons. First, the panel correctly notes that there are only four, not 24, counties in the Rio Grande Valley. However, as Plaintiffs contend, this error was likely typographical and probably a result of the court's efforts to issue an opinion before the admitting-privileges provision was set to go into effect—less than one week after the completion of trial. Such an error does not render the district court's finding that the Rio Grande Valley will be without an abortion provider clearly erroneous, given that (as will be discussed directly below) the record adequately supports the substance of this finding—that the region will lack any abortion providers after the admitting-privileges provision goes into effect.

In addition to faulting the district court for its apparent typographical error, the *Abbott II* panel concluded that the court's finding that the Rio Grande Valley would be without an abortion provider was clearly erroneous because the court only accepted evidence as to one of the two clinics in the Rio Grande Valley, and that the other evidence was excluded as hearsay. *Abbott II*, 748 F.3d at 597. Before H.B. 2 went into effect, there were two clinics in the Rio Grande Valley that provided abortion services—the WWH's McAllen facility, and the Reproductive Health Care and Health Services Facility ("RHCHS"). The panel reasoned that because Amy Hagstrom-Miller's testimony regarding the RHCHS facility was excluded as hearsay, the court only heard admissible evidence as to whether the WWH facility would close, and thus it was clearly erroneous to conclude that both clinics would close. *Id.*

23

at 597, n.12.  However, the panel overlooks the un-objected-to live testimony of Andrea Ferrigno, the Corporate Vice President of WWH, which establishes, with admissible evidence, that both of the two clinics in the Rio Grande Valley will close.

Specifically, Ferrigno testified that the RHCHS Facility and the WWH's McAllen facility will *both* close as a result of the admitting-privileges provision.  At the time of trial, Ferrigno testified that the RHCHS Facility had already announced its impending closure, and that the WWH's McAllen clinic would also close because none of its providers has admitting privileges, and therefore, "people won't have access to safe legal services in the entire Rio Grande Valley." *Id.*  This information regarding both clinics' closures in the Rio Grande Valley is also contained in Ferrigno's sworn declaration, which was admitted into evidence by the district court under the residual hearsay rule, FED. R. EVID. 807.  *See Abbott,* 951 F. Supp. 2d at 897, n.3 ("The court *overrules* Planned Parenthood and the State's objections [to the use of declarations at trial because] admitting the declarations will best serve the rules of evidence and the interests of justice.") (emphasis added).  Therefore, contrary to the *Abbott II* panel's conclusion, the district court's finding that the only two clinics in the Rio Grande Valley will close is not clearly erroneous because it was supported by admissible record evidence.

### 3. Abortion Clinic Physicians Will be Unable to Meet Hospitals' Varying Prerequisites to Admitting Privileges

The district court's finding that each hospital's bylaws are unique and have a variety of prerequisites for granting admitting privileges, some of which abortion providers will be unable to meet, is supported by the record.  For example, Andrea Ferrigno testified that, before granting admitting privileges, hospitals have various facial requirements, including that the physician

maintain a local residence, be board certified, and have a minimum number of hospital admissions and surgeries. Ferrigno testified that her current abortion providers would not qualify for many hospital admitting-privileges applications because they would not meet the hospitals' residency requirements nor do they have the number and type of prior hospital admissions typically required. For example, some hospitals require at least 50 deliveries, five C-sections, and 25 gynecological surgical procedures during the 24-month period preceding the physician's application. Ferrigno testified that, in the last five years, her physicians have seen approximately 50,000 abortion patients, and only eight to ten of those patients required a transfer from the clinic to a hospital. Her providers thus do not regularly admit or treat patients at hospitals and, consequently, will not meet the hospitals' admission or surgery prerequisites for obtaining admitting privileges. Further, many of the abortion providers completed their licensures decades ago, when it was less common to have board certification, and therefore will not meet the board certification requirement.

Likewise, Dr. Paul Fine testified that his organization's Fort Worth surgery center will have to stop providing abortion services because all of the providers, who reside in Dallas, will be unable to obtain admitting-privileges at the Fort Worth hospital, which requires physicians to maintain a local residence. Dr. Jennifer Carnell similarly testified that, if abortion providers travel away from their county of residence to conduct abortion services—a common practice given that 87 percent of counties in the United States are without an abortion provider—then local Texas hospitals will not grant the physician privileges. For example, he testified that, in West Texas, where all of the providers travel hundreds of miles or from out of state to provide abortion

services, the physicians will be unable to comply with the admitting-privileges provision. The district court therefore did not clearly err when it found that the vast majority of abortion providers in Texas will be unable to obtain admitting privileges at local hospitals.

### 4. Finding Local Physicians with Active Admitting Privileges is Difficult and Unlikely

The district court found that abortion clinics will be unlikely to find physicians with active admitting privileges because physicians' contracts often "bar them from providing 'moonlight' services as abortion providers," and physicians are concerned about the negative impact on their careers by associating with an abortion provider, either for financial reasons or negative attention from anti-abortion protestors. *Abbott*, 951 F. Supp. 2d. at 901. The district court directly referenced record evidence that supports this finding of fact. For example, the district court noted Amy Hagstrom-Miller's testimony that some physicians' contracts with hospitals "prevent[] them from working with abortion care on the side." The evidence further demonstrated that, even when abortion care is not forbidden outright, some local hospitals are averse to associating with abortion providers. For example, Andrea Ferrigno attested that in at least three attempts to contact hospitals about obtaining admitting privileges for her physicians, the hospitals' personnel verbally discouraged her from pursuing an application "because of hostility against abortion providers among members of the hospital's governing board."

Furthermore, the Plaintiffs presented evidence that hostility, harassment, and violence from anti-abortion protestors towards abortion providers, clinics, and patients will deter local physicians with admitting privileges from providing services. For example, Dr. Jordan attested that in the small and "extremely socially conservative community" of Fort Worth, any

resident abortion provider would face "routine harassment, social and professional ostracism, and even a significant risk of violence (all of which extend to his or her family as well)." He added that, "[h]ostility to abortion also makes it impossible to hire a new doctor who lives in Fort Worth and has privileges at a local hospital." Similarly, Angela Martinez, the Clinic Director of Planned Parenthood Women's Health Center in Lubbock, Texas, attested that anti-abortion protestors harass the health center employees every day her clinic is open. Martinez explained that at her facility, anti-abortion protestors

> shout insults at us every day, take pictures of us (and take down license plate information), refer to employees by name, and have protested outside employees' homes and posted pictures of employees online with their names. Because physicians are the biggest target of antiabortion harassment and violence . . . I am unaware of any Lubbock physician ever having performed abortions. . . .[F]or decades . . . the physicians who performed abortions [in Lubbock] have travelled . . . from another part of the state, most frequently from Dallas.

Likewise, Hagstrom-Miller testified that at the WWH facilities, they regularly have protestors, have received bomb threats, and receive threatening phone calls. Further, staff are followed and sometimes the physicians are harassed when they are coming to and from work. Hagstrom-Miller also testified regarding "Operation Rescue," an anti-abortion effort that targeted two physicians, publishing their names online, apparently to encourage attention and further harassment from anti-abortion protestors. Hagstrom-Miller testified that physicians will be deterred by this "very regular[]" occurrence of harassment and violence committed against abortion providers.

She recalled at least two physicians who changed their mind about working for WWH and one who quit based on anti-abortion harassment. She testified that because of this local hostility, she has been flying in two providers from out of state to be able to meet the needs of women in the local communities. The district court's finding that abortion facilities are unlikely to be able to hire local physicians to perform abortion services is thus adequately supported by the record.

### 5. Additional Record Evidence of Obstacles: Loss of Capacity, Poverty, Travel Distances, and Other Factors Affecting Access to Abortion

In addition to the record evidence substantiating the district court's express findings of facts, the Plaintiffs also presented evidence that supports the district court's legal conclusions, but which the court neglected to reference expressly. First, the evidence established that, as a consequence of the clinic closures, the remaining clinics will be unable to meet the increased demand for abortion services, resulting in substantially diminished access to abortion for women in Texas. Dr. Potter explained that, while some clinics may remain in operation because they employ one or more physicians with local admitting privileges, these remaining clinics may have a reduced capacity, as not all of their physicians on staff have the requisite privileges. While capacity is reduced, the demand upon these limited facilities will be increased, as women who would have otherwise obtained abortion services from closed facilities, now will seek services at the remaining providers. Based on the increase in demand and simultaneous reduction in capacity, Potter found that

> in five of the seven counties [that will still have abortion clinics after the admitting-privileges provision goes into effect], there will be a substantial increase in the projected volume of

28

services required due to closure of clinics in other counties that will no longer have a provider. Moreover, there will be a substantial reduction in the capacity to provide services in four of these five counties. . . . All told, the projected demand for abortion care statewide is 68,8889, and the expected capacity after implementation of the law is only 43,850. The implication is that 25,039 women will not be able to access abortion care in the state, even if they could travel the long distances necessary to access the nearest clinic with capacity to serve them. Eighty-nine percent of this deficit, or 22,286 abortions, is due to closures that will occur as a result of the implementation of the challenged provision.

The Plaintiffs presented Potter's specific calculations regarding the capacity and demand for each county in which there would be a substantial change. For example, in Bexar County, where there were once eight abortion providers, after the admitting-privileges provision goes into effect, only three will remain—one of which will function at an extremely limited capacity. Therefore, the providers that will remain in operation in Bexar County will be unable to meet the demand for abortion services.[8] Angela Martinez, the Clinic

---

[8] More specifically, in Bexar County, at the time of trial, there were five clinics (three have closed since 2011 after funding cuts). Potter concluded that two would close after the law was implemented and that one would have extremely limited capacity. Potter projected the demand at 7,006 abortions per year and capacity was calculated at 4,250. Thus, the projected volume would exceed capacity by 2,750 abortions annually. In Dallas, Potter attested that two of the five clinics would close and the projected volume will "increase dramatically" by 51% to 22,598. The capacity in Dallas would then only be approximately 12,5000, barely more than half the expected demand volume. Potter concluded that the projected volume would therefore exceed capacity by 10,098 abortions per year.

In El Paso, Potter found that one of two clinics would close and the projected volume would exceed capacity by approximately 2,500 abortions per year. In Harris County, three or four of the ten providers would close and the projected volume increase on remaining clinics will be approximately 16%. In Neuces County one clinic was expected to stay open,

Director of Planned Parenthood Women's Health Center, corroborated this evidence in her declaration, attesting that when nearby clinics in Midland, Abilene, and San Angelo closed in recent years, their Lubbock facility has as a result been "inundated with patient calls" and are currently "scheduling patients up to a month in advance." Similarly, Hagstrom-Miller testified that in Austin she has one physician with privileges and one without so, after the admitting-privileges provision goes into effect, her capacity to provide services at her Austin facility will decrease by 50%.

An inevitable result of the reduced capacity of abortion providers in Texas is an increase in delayed services for abortion patients. Potter attested that reduction in supply and increase in demand will mean that the "delays to obtain an appointment with many providers will increase, and some providers may *turn patients away entirely*." (emphasis added). He attested that "[a]bortion is of course a time-sensitive procedure: having to wait a few weeks may make it impossible for women to get an abortion."

In addition to the increased demand and delay that the Plaintiffs' established will result from the admitting-privileges provision, the evidence demonstrated that because of the various clinic closures, women in the panhandle and other parts of West Texas will have to travel vast distances to seek in-state abortions, and that a large percentage of women who seek abortion services are impoverished and will therefore be precluded from ever obtaining abortion services. Potter testified that, in the panhandle of Texas,

---

but would have an 182% increase in volume due to the expected closures of the only two clinics in the Rio Grande Valley, and the Neuces County Clinic thus was unlikely to meet the increased demand. In Travis County, Potter found that three of the four clinics were expected to stay open, but would experience a volume increase of 26%. Potter concluded that the projected volume for Travis County would exceed capacity by 3,401 abortions per year.

women will have to travel 400-500 miles to access legal abortion services. He explained that "[s]ome women who would otherwise have gotten an abortion will be prevented from doing so by these burdens." Potter also testified that the number of women across Texas who will be required to travel over one hundred miles to obtain an abortion will double, and that in "multiple counties," the travel distance for women seeking abortions will "exceed 400 miles." Furthermore, the evidence demonstrated that there will be no abortion clinics west of Interstate 35, requiring women in certain West Texas areas to travel between six and eight hours to access an abortion clinic.

The Plaintiffs' evidence established that nearly half of abortion patients in Texas are below the federal poverty line and therefore will be unlikely to be able to travel these long distances to access abortion services. Specifically, data from Dr. Potter's research in Texas indicated that approximately 40% of women seeking abortion are at or below 100% of the Federal Poverty Guidelines." Angela Martinez attested that most of Planned Parenthood Women's Health Center's clients in Lubbock are parents below the federal poverty line who "often have trouble obtaining use of a car and the resources to pay for gas, permission from their employer to take the necessary time off, and/or childcare." As Potter attested, the burden of travel is higher for younger women, women of color, and low-income women, who have fewer resources to overcome the increased cost of further travel. Martinez's experience confirms this, as she has repeatedly heard from patients that the additional distance will make it impossible for them to obtain an abortion. Martinez attested that, "[b]ased on [her] familiarity with [the clinic's abortion] patients and their already-difficult situations, I believe that this change [in the law] would be extraordinarily difficult for almost all of our patients, and could prevent many

31

of them from obtaining an abortion at all." Ferrigno similarly testified that that the reality is that for women in the Rio Grande Valley to travel to Corpus Christi or San Antonio for abortion services will require "a lot of arrangements and expenses."

In addition to the Plaintiffs' evidence that the admitting-privileges provision will severely diminish women's access to abortion services, the evidence demonstrated that the provision will be particularly burdensome on women seeking abortions who have been pregnant for sixteen weeks or longer. Prior to implementation of H.B. 2, Texas law required that an abortion performed at sixteen or more weeks after pregnancy must be conducted at an ambulatory surgical center ("ASC"). At the time of trial, there were only six providers in the state that are licensed as ASCs. Potter attested that three of these ASCs will stop providing services as a direct result of the admitting privileges law, leaving only three operating ASCs in Texas (located in Dallas, Houston, and San Antonio). Dr. Jordan likewise attested that his facility (Planned Parenthood of Greater Texas) operates the only ASC in both Austin and Fort Worth—which are two of the six total ASCs providing abortion services in the state—and both of those facilities will have to close after enactment of the law. Therefore, women throughout all of Texas will only have three locations where they can legally obtain an abortion after sixteen weeks of pregnancy.

In light of this abundance of evidence supporting the district court's findings of facts regarding the ways in which H.B. 2's admitting-privileges provision imposes obstacles upon a woman's right to obtain a previability abortion, the *Abbott II* panel erred in rejecting the district court's findings.

32

**B. Justifications**

The parties disagreed about the strength of the State's justifications for the admitting-privileges requirement. According to the State, the admitting-privileges requirement has two strong justifications, both grounded in the State's legitimate interest in protecting women's health. Primarily, it argued that the requirement ensures proper care for complications. Furthermore, it asserted that the requirement has a secondary benefit of "credentialing" high-quality doctors. After considering the State's evidence that was submitted to support its argument that the admitting-privileges provision advances patient care and protects women's health, the district court rejected the State's arguments and found that an abortion doctor's "lack of admitting privileges is of no consequence when a patient presents at a hospital emergency room," because "emergency-room physicians treat patients of physicians with admitting privileges no differently than patients of physicians without privileges" and therefore the admitting-privileges provision has no effect on the quality or timeliness of care received, nor does it impact the ability of providers and physicians to communicate any necessary health information. *Id.* at 899-900.

1. **Admitting Privileges Have No Bearing on Quality or Timeliness of Care, nor on Communications Between Abortion Providers and Emergency Room Physicians**

The Plaintiffs presented evidence that on the extremely rare occasion that an abortion patient requires hospital admission because of a complication from an abortion procedure, the patient is treated just as all patients are—she is independently assessed and diagnosed by the emergency room medical staff, without the need to rely upon a patient's treating or referring physician. Plaintiffs presented the testimony and sworn declaration of Dr. Paul Fine, who

is board-certified in obstetrics and gynecology, a Fellow of the American Congress of Obstetricians & Gynecologists, a Professor in the Departments of Obstetrics & Gynecology and Urology at the Baylor College of Medicine in Houston, the Medical Director of Planned Parenthood Gulf Coast and Planned Parenthood Center for Choice, Inc., the Medical Director of Emergency Medical Services ("EMS") for three cities in Galveston County, Texas, and who has nearly four decades of experience providing abortions, teaching abortion methods, and supervising the provision of abortion services. Dr. Fine testified that when an abortion doctor is unable to communicate with a treating physician or abortion provider, this does not hinder the care the patient receives. Rather, "[t]he treatment of most [abortion] complications are very straightforward . . . and treated the same way." If an abortion patient requires hospitalization for a complication following an abortion procedure, medical staff at the hospital will determine whether an on-call ob/gyn will need to be involved, or whether another "sub-specialist" will be necessary to treat the patient. Dr. Fine attested that "all ob/gyns, regardless of whether they perform abortions, are qualified to manage the care of a patient experiencing a complication from an abortion."

In addition, Dr. Jennifer Carnell, an emergency physician, assistant professor at Baylor College of Medicine in emergency medicine, the director of the emergency ultrasound fellowship, and who is board-certified in emergency medicine, was certified by the court as an expert in the field of emergency medicine. Dr. Carnell testified that if an abortion patient presents at a hospital with a rare, severe complication, the abortion provider will not be the physician performing the treatment; rather, the on-call ob/gyn at the hospital will provide the necessary care. Thus, an abortion provider's inability to

personally admit his patient into a local hospital does not impede the patient's treatment in any way and does not constitute "abandoning" the patient, as the State contended. Instead, the patient is cared for by those physicians who can best perform the procedure—emergency room physicians who "do these surgeries every day." Dr. Fine explained that

> admitting privileges are . . . irrelevant to providing optimal care in the event of a complication because the physician who provides the abortion may not be the appropriate physician to manage the patient's care in the hospital, regardless of whether the physician has privileges there. Given that abortions have such a low complication rate, abortion providers may . . . only rarely perform the types of surgeries . . . that may be necessary to treat a complication, while the on-call ob/gyn at the hospital will have more experience doing these procedures . . . .

Dr. Fine also attested that "[g]iven how specialized the practice of medicine has become, particularly in a hospital setting, such handoffs to the appropriate specialists are common and necessary across medicine."

Dr. Fine further stated that the "admitting privileges requirement is . . . unnecessary and irrelevant to providing optimal care because of the distances some women travel to obtain an abortion." Dr. Fine explained that generally, when complications occur, a woman will begin to experience the complication after she has left the clinic and returned home. "If, after discharge from the abortion clinic, a woman who lives outside the area where she obtained her abortion experiences a complication that requires hospital treatment, it makes no sense for her to travel to be treated at a hospital near the abortion clinic just because her abortion provider has admitting privileges

35

there." Rather, she should and likely would go to the closest hospital emergency room to get prompt treatment. Dr. Fine explained that, "[i]n an emergency or potential emergency situation, no physician, or EMT, would countenance going further than necessary just to get to a hospital where her abortion provider has privileges."

Dr. Fine explained that the current professional standards therefore suggest only that abortion clinics have "arrangements in place for transferring patients who require emergency treatment," but do not require that the "physician performing abortions have admitting privileges at a hospital." Such is the recommendation from the American Congress of Obstetricians & Gynecologists, as well as Planned Parenthood Federation of America, and the National Abortion Federation. Moreover, prior to implementation of H.B. 2, Texas law required the same for abortions performed after sixteen weeks of pregnancy or later—riskier procedures than abortions performed before sixteen weeks that are required to be performed in a licensed ASC. And, notably, physicians who perform more dangerous outpatient surgeries at ASCs, such as hysterectomies or pelvic constructive surgeries, are likewise only required to have *either* written transfer agreements *or* hospital admitting privileges, and therefore are not required to have hospital privileges. Dr. Fine opined that in his expert opinion, "there is no reason to place a *more onerous* requirement on doctors who provide abortions prior to 16 weeks, . . . than is placed on providers of much more risky [non-abortion] surgeries performed in ASCs."

The record evidence also established that legal abortion is one of the safest medical procedures in the United States. Jennifer Carnell, M.D., testified that in her nine years of experience in emergency medical care, she

36

has seen less than ten patients come to the emergency room following an abortion procedure; only five of those patients actually required admission; and none were critically ill. The evidence established that the risk of a woman experiencing a complication that requires hospitalization is less than 0.3%. The risk of death associated with childbirth is approximately fourteen times higher than that associated with abortion, and every pregnancy-related complication is more common among women having live births than among those having abortions. In fact, the risk of death associated with abortion is almost three times less than that associated with using penicillin, which could in some rare cases result in anaphylactic shock. Thus, the few abortion patients who develop serious problems are referred to hospital emergency room physicians who may call in other on-staff specialists if necessary.

The evidence therefore established that it is not necessary for an abortion doctor to have admitting privileges to refer patients to a hospital emergency room doctor, and requiring them to have admitting privileges will not increase the speed or quality of medical care for the few abortion patients that need such attention after an abortion. Given the record evidence that emergency room physicians are adequately trained to assess and treat any abortion complications, and that in the rare instance of a severe complication from an abortion, the on-call ob/gyn is better suited to perform the necessary treatment, the district court did not clearly err by finding that the admitting-privileges provision does nothing to improve quality of care for abortion patients who require emergency treatment.[9]

---

[9] *See also Brief of Amicus Curiae, the American College of Obstetricians and Gynecologists and the American Medical Association*, at 1, *Abbott II* (No. 13-51008) ("There is simply no medical basis to impose a local admitting privileges requirement on abortion

Additionally, the Plaintiffs' evidence supports the district court's finding that the admitting-privileges provision does not improve communication between abortion providers and emergency room physicians, nor is there any evidence that such a communication problem exists. The Plaintiffs' evidence established that emergency room physicians generally have no need to consult with an abortion provider whose patient presents at the hospital because the hospital physicians have the requisite skills necessary to treat abortion complications, which are often similar to symptoms of a spontaneous miscarriage—a condition that emergency room physicians treat regularly. Dr. Carnell testified that all of the abortion patients she has treated in the emergency room had pain and vaginal bleeding—conditions "well within [her] purview" of practice that did not require communication with the abortion provider. Further, even in severe cases of hemorrhage or sepsis, emergency room physicians see those conditions "all the time" and are "trained and very comfortable treating" them. Dr. Fine similarly attested that "[e]mergency room physicians are qualified to initially evaluate and treat most complications . . . [s]uch skills are the same as those needed for the treatment of spontaneous miscarriages."

Moreover, the evidence established that Texas regulations in place before the enactment of H.B. 2 adequately provided for effective communication between abortion providers and emergency room physicians. Under Texas law prior to enactment of H.B. 2, all physicians who practice at any licensed abortion facility must

---

providers."); *id.* at 6 ("The care a woman receives at the emergency room is independent of, and not contingent on, her abortion provider having admitting privileges.").

have admitting privileges or have a working arrangement with a physician(s) who has admitting privileges at a local hospital in order to ensure the necessary back up for medical complications. [The facility also must] have a readily accessible written protocol for managing medical emergencies and the transfer of patients requiring further emergency care to a hospital.

25 TEX. ADMIN. CODE § 139.56(a). Texas law also already required all women undergoing abortions to be provided a "telephone number by which [she] may reach the physician, or other health care personnel employed by the physician or by the facility where the abortion was performed or induced with access to the woman's relevant medical record, 24 hours a day to request assistance for any complications that arise from the performance or induction of the abortion or ask health-related questions regarding the abortion." *See* TEX. HEALTH & SAFETY CODE § 171.0031(2)(A).

Dr. Carnell testified that "very rarely, if ever," do the referring physicians have admitting privileges at her hospital and, yet, to provide optimal care, she is able to have all the information she needs communicated to her over the telephone. Carnell testified in her expert opinion that she would not be better able to communicate with a referring physician if that physician had admitting privileges at the hospital. Carnell has in fact never seen an outpatient physician—either after an abortion procedure or any other outpatient procedure—accompany his or her patient to the hospital to communicate with the emergency room physician. Instead, if an emergency room physician needs to communicate with a referring physician, that communication occurs via telephone. Andrea Ferrigno similarly attested to WWH's practice of ensuring that the abortion provider speaks with the

39

emergency room's admission staff and the backup physician via telephone to ensure any necessary information is transmitted to the caregiver at the hospital. Dr. Fine similarly testified that it is the "standard medical practice" for an emergency room physician to communicate with an abortion provider by telephone, regardless of whether the provider has admitting privileges at the hospital. Dr. Fine added that when a patient is transferred to the hospital from an abortion clinic by ambulance, the patient is transferred with a copy of her records that contain all the necessary information for proper continuity of care, including, for example, the procedure performed, any medication already provided, and anything else that occurred at the outpatient clinic. Accordingly, the district court did not clearly err in concluding that there is no evidence of a harmful communication problem between abortion providers and emergency room physicians and that, even if there were one, H.B. 2 does not improve any potential communication issues.

As noted, the district court also found that the admitting-privileges provision does nothing to get patients faster access to care, because the practice at hospitals is to treat all patients, regardless of their treating physician, with "all possible haste." *Abbott*, 951 F. Supp. 2d at 900. Dr. Carnell testified that all patients at the emergency room go through triage, where an emergency room medical staff "sees [the patient] quickly, evaluates their vital signs, and then [the patient is] placed . . . on a list to be seen." The entire triage process happens in under three minutes, regardless of whether the patient's treating physician has admitting privileges at the hospital. Dr. Fine likewise testified that "if the [abortion] patient in the rare situation needs to go to the operating room," her abortion providers' lack of admitting privileges has no bearing on how quickly the operation will occur because a physician, with or without

40

admitting privileges "can't reserve an operating room for [her] patient," but rather, patients are treated based on the gravity of his or her condition and need for immediate treatment. Thus the district court's finding that the admitting-privileges provision is of no consequence to abortion patient's treatment at an emergency room is not clearly erroneous.

## 2. The District Court Properly Found that the State's Evidence Did not Support Its Justification Arguments

In response to the Plaintiffs' evidence, the State submitted seven sworn declarations in an effort to establish that the admitting-privileges provision improved quality of care for abortion patients and increased effective communication between abortion providers and emergency room physicians. The *Abbott II* panel summarized the State's evidence regarding the justifications for the provision as follows:

> Dr. John Thorp, a board-certified Ob/Gyn, . . . referred to several studies [to support his assertion that the provision improves continuity of care], including a report of a joint commission of hospitals, including Johns Hopkins, Mayo Clinic, and New York Presbyterian, which concluded that "80 percent of serious medical errors involve miscommunication between caregivers when patients are transferred or handed-off." Dr. James Anderson, an ER physician, also testified that an abortion provider with admitting privileges is better suited than one not admitted to know which specialist at the hospital to consult in cases where an abortion patient presents herself at an ER with serious complications. Further, Dr. Thorp doubted that without the admitting-privileges requirement hospitals in Texas could, as

41

Dr. Fine suggested, promptly treat women with abortion-related complications. This was because 73 percent of ERs nationwide, according to a statistic cited by Dr. Thorp, lack adequate on-call coverage by specialist physicians, including Ob/Gyns. Thus, requiring abortion providers to obtain admitting privileges will reduce the delay in treatment and decrease health risk for abortion patients with critical complications.

Dr. Thorp also opined that the admitting-privileges requirement would ensure that only physicians "credentialed and board certified to perform procedures generally recognized within the scope of their medical training and competence" would provide abortions. Dr. Mikeal Love, a board-certified Ob/Gyn, concurred that the admitting-privileges provision enlists hospitals to "screen out" untrained and incompetent abortion providers, who could not continue in the abortion practice if they were not able to obtain admitting privileges. . . .

Finally, Dr. Thorp disputed Dr. Fine's conclusions as to the percentage of abortions that result in complications. According to Dr. Thorp, the 0.3 percent estimate of women requiring hospitalization from abortion complications is based on data that are thirty-eight years old. Dr. Thorp further testified that complications from abortion are underreported, and he cited a study indicating that only one-third to one-half of abortion patients return to their clinic for follow-up care.

*Abbott II*, 748 F.3d at 592-93. Nothing in the State's evidence, either summarized by the panel or contained in the record, makes the district court's

findings of fact implausible and, thus, this court is obliged to uphold the district court's findings, detailed *supra*. Further, the panel's representation of the record evidence mischaracterizes the strength of the State's evidence.

First, with regard to the State's contention that the admitting-privileges provision improves continuity of care and communication between abortion providers and emergency room physicians, the district court rejected this argument, reasoning that the State's evidence that approximately 80% of serious complications are caused by miscommunication during patient hand-offs does not demonstrate whether there are any communication problems between abortion providers and emergency room physicians. *Abbott*, 951 F. Supp. 2d at 899 ("The State . . . provides no evidence of correlation between admitting privileges and improved communication with patient handoff or that a communication problem actually exists between abortion providers and emergency-room physicians."). Review of the Joint Commission's study that the panel relies upon, reveals that it is a two-page report that does not address whether communication problems exist between abortion providers and hospital physicians nor whether communication between abortion providers and emergency room physicians would be improved were all abortion providers able to maintain local hospital privileges. Rather, the report cited by Dr. Thorp primarily addresses internal hand-offs between caregivers or teams of caregivers at hospitals, with brief mention of external hand-offs, and makes recommendations for improving communication between providers during hand-offs—none of which include any mention that all providers transferring patients have admitting privileges, or that admitting privileges in any way impact the effectiveness of the communication between caregivers upon the patient's transfer. *See Facts about the Hand-off Communications Project,*

JOINT COMM'N CTR. FOR TRANSFORMING HEALTHCARE, *available at* www.centerfortransforminghealthcare.org/assets/4/6CTH_HOC_Fact_Sheet.p df (last visited July 7, 2014). Similarly, the other studies that Dr. Thorp cites to support the contention that the admitting-privileges provision promotes effective communication, reflect only the potential danger that may occur upon miscommunication during a hand-off. None conclude that requiring external physicians to maintain local hospital privileges will improve communication upon transfer. Rather, the studies suggest that other measures have been proven to enhance communication and reduce risk of injury, for example, establishing a standardized form and providing ample time for physicians to communicate with one another. *See, e.g.,* Julie K. Johnson, et al., *Searching for the missing pieces between the hospital and primary care: mapping the patient process during care transitions*, OPEN ACCESS, *available at* http://qualitysafety.bmj.com/content/21/Suppl_1/i97.full.pdf+html (recommending "process mapping" to work towards building "safe and reliable patient transitions"); *see also Improving Transitions of Care: Hand-Off Communications*, JOINT COMM'N CTR. FOR TRANSFORMING HEALTHCARE, *available at* http://www.centerfortransforminghealthcare.org/assets/4/6/CTH_Hand-off_commun_set_final_2010.pdf (last visited July 7, 2014) (recommending, *inter alia*, that hospitals make successful hand-offs an "organization priority," that the hospital "develop and use standardized forms," and allow for ample opportunity for caregivers to ask questions"). The State's experts rely on this sort of evidence to conclusorily contend that "holding local hospital admitting privileges is likely to minimize communication errors."

Similarly, the *Abbott II* relies in part upon the State's evidence that 73% of hospitals report inadequate availability of on-call specialists, to suggest that the admitting-privileges provision will help ensure prompt treatment directly from the abortion provider, rather than relying on a hospital's on-call ob/gyn to treat complications that follow abortion procedures. The cited report, dated 2007, in turn cites a 2006, nationwide study for the proposition that 73% of hospitals have inadequate on-call coverage. The data therefore is at least seven years old, and does not indicate whether different states or specialties have varying availability. Thus, this data does not adequately rebut the Plaintiffs' evidence established by its experts, who have decades of experience in emergency medical care in Texas, that emergency room physicians and on-call specialists are adequately trained to handle the treatment of abortion patients who present at the hospital with complications, and that in fact, the on-call ob/gyn is better qualified to handle a severe complication than the abortion provider. Rather than defer to the district court's finding of facts, the *Abbott II* panel looked at the State's evidence *de novo* and concluded that "[r]equiring abortion providers to have admitting privileges would also promote the continuity of care in all cases, reducing the risk of injury caused by miscommunication and misdiagnosis when a patient is transferred from one health care provider to another." *Abbott II*, 748 F.3d at 595. The panel improperly draws this conclusion by analyzing the record *de novo* and relying upon evidence that the district court considered and reasonably rejected.

With regard to the State's evidence that requiring admitting privileges "screens out" unqualified providers and holds abortion providers to a higher standard of care, the Plaintiffs' evidence rebuts this contention by establishing that hospital boards have a variety of reasons for rejecting a physician's

45

application for privileges, which may have nothing to do with the provider's abilities or experience, and instead, may be for reasons completely divorced from medicine, such as their anti-abortion sentiments or the physicians' home address. *See supra*, Section II, A, 3-4. Moreover, despite the State's and the *Abbott II* panel's contention that federal and state laws prohibit discrimination against abortion providers and therefore hospitals will not reject abortion providers based on anti-abortion sentiments, the Plaintiffs' evidence established that anti-discrimination laws are unlikely to prevent hospital boards' discrimination against abortion physicians seeking admitting privileges. The board is not required to announce or disclose its bases for a decision, and may simply reject an application without stating a particular reason. Dr. Fine thus explained that the law may protect a physician who already has staff privileges or is a hospital employee from wrongful termination, but it does not guard against boards discriminating against abortion providers in the application process for admitting privileges because physicians denied admitting privileges "never find out why."

Furthermore, the State's own experts have suggested that the admitting-privileges provision is not necessary to improve the quality of care that abortion patients receive. For example, Dr. Mikael Love concedes that the State's interests would be adequately served by simply requiring abortion providers to maintain a relationship with a local surgeon with admitting privileges. Dr. Love attests that "[a] responsible surgeon who abides by the standard of care will have admitting privileges *or a relationship with a surgeon who does*." (emphasis added). As noted, such a relationship with a physician with admitting privileges is all that is required of abortion providers who perform abortions at sixteen weeks or more at ASCs—a riskier procedure than

abortions provided at other outpatient facilities. Moreover, the evidence established that in various abortion clinics, the facilities have emergency plans in place that adhere to this recommendation. For example, Ferrigno attested that all WWH facilities "have an emergency protocol in place to ensure the safety of . . . patients in the rare event of complications requiring hospitalization. . . . [T]he physician will remain with the patient until the transfer [to the hospital] is completed. The physician will then be placed on the telephone with the hospital emergency room admitting staff and with his or her backup physician (the physician with local admitting privileges with whom he or she is required to have a working relationship to assist with complications) and provide the backup physician with information about the patient. The backup physician can then meet the patient when she arrives at the hospital, or will be asked to remain on call, as necessary."

In sum, the State's evidence does not demonstrate the need for abortion providers to have local admitting privileges in order to facilitate communication or improve the standard of care abortion patients receive and thus does not render the district court's findings of fact implausible in light of the record as a whole. Accordingly, the panel erred by crediting the State's evidence that the district court rejected, and disregarding the court's findings of facts that were substantially supported by the record evidence.

## III. *Abbott II* Panel's Improper Application of Undue Burden Test

In addition to its failure to give proper deference to the district court's findings of fact, throughout its discussion of the effects that the admitting-privileges provision of H.B. 2 will have upon a woman's right to a previability abortion, the panel contravened *Casey* by: (1) failing to weigh the extent and severity of the burden the law imposes on women against the strength of the

State's legitimate justifications, thereby neglecting to do the balancing that is at the heart of *Casey*; and (2) misapplying *Casey*'s "large fraction" test by looking to the burden imposed upon all women in Texas seeking abortions, declining to consider the particular circumstances of the women affected by the law, and disregarding evidence of relevant contextual facts.

## A. Panel's Failure to Weigh Obstacles against Strength of State's Justification

As discussed *supra,* to give proper consideration to both the State's legitimate objectives and women's liberty interests, the undue burden standard announced in *Casey* charted a middle-of-the-road path between strict scrutiny and rational-basis review. Similar to the analysis employed by the Court in its ballot-access cases, when considering whether the burden placed upon women by a challenged abortion regulation is undue, we must weigh the extent, character, and magnitude of the obstacles placed in the path of women seeking previability abortions against the strength of the state's justifications. *Casey,* 505 U.S. at 878 ("To protect the central right recognized by *Roe v. Wade* while at the same time accommodating the State's profound interest in potential life, we will employ the undue burden analysis."). As the author of *Abbott II* has explained, "[a]s long as *Casey* remains authoritative, the constitutionality of an abortion regulation thus turns on an examination of the *importance* of the State's interest in the regulation and the *severity* of the burden that regulation imposes on the woman's right to seek an abortion." *Barnes v. State of Miss.*, 992 F.2d 1335, 1339 (5th Cir. 1993) (emphasis added) (Jones, J.). Our sister circuits have agreed that the undue burden test encompasses a weighing of the magnitude of the state's interest against the extent of the burden imposed by the regulation. *See Humble,* 753 F.3d at 914

(9th Cir. 2014) ("[We must] weigh the extent of the burden against the strength of the state's justification in the context of each individual statute or regulation."); *Van Hollen*, 738 F.3d at 798 ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous."). *Casey* instructs, and the very meaning of the term "undue" implies, that the harsher the obstacle resulting from a regulation, then the more robust the government's justification must be. *See, e.g.*, *Casey*, 505 U.S. at 874, 901; *Anderson*, 460 U.S. at 789; *see also Strange I*, 2014 WL 1320158, at *13.

Rather than consider the *strength* of the State's interests against the extent of the burden imposed by the admitting-privileges provision, the *Abbott II* panel instead deferred to the State's proffered "conceivably" rational justifications for the law, and disregarded evidence establishing the extent of the burden placed upon women by the admitting-privileges requirement. In so doing, the *Abbott II* panel never expressly addressed whether the State's interests were actually furthered by H.B. 2's admitting privileges-provision, nor did it consider the strength or importance of the State's justifications, let alone weigh the strength of the governmental interests against the burden imposed upon women—an analytical error which our sister circuits have already observed is inconsistent with Supreme Court precedent. *See Humble*, 753 F.3d at 914 ("We conclude that *Abbott* . . . [is] inconsistent with the undue burden test as articulated and applied in *Casey* and *Gonzales*. . . .[in part because it] fails to recognize that the undue burden test is context-specific, and that both the severity of a burden and the strength of the state's justification can vary depending on the circumstances.").

The *Abbott II* panel, in a perfunctory analysis, altogether failed to conduct the weighing of burden against justification that the *Casey* "undue burden" standard requires. Instead, the panel looked to the burden imposed by the admitting-privilege provision in isolation, without comparing the magnitude of the burden on a woman's right to procure an abortion to the strength (or lack thereof) of the State's justifications, as *Casey* requires. *Casey*, 505 U.S. at 888-896; 900-01. The panel's simplistic and deferential approach is a patent disregard of the dictates of *Casey*. Indeed, under the panel's analysis, the *Casey* "undue burden" test simply requires courts to assess whether an abortion restriction has the "purpose" or "effect" of imposing a "substantial obstacle" in the path of a woman seeking an abortion, each in isolation of the other, without any meaningful analytical substance.

The weighing or balancing necessary under *Casey* gives meaningful form and content not only to what constitutes a "substantial obstacle" but also to the abortion right itself because, absent balancing, the Government could permissibly enact legislation that only marginally advanced its interests while significantly hindering women's access to abortion—just as Texas has done here. This is not what *Casey* requires. Indeed, *Casey* itself conducted this exact sort of balancing, which we are obliged to follow. *See, e.g., Casey*, 505 U.S. at 900-01 (balancing the State's legitimate interest in collecting patient information—which the Court deemed a "vital element of medical research"— against the only "slight" increase in cost of abortions, and therefore upholding the challenged recordkeeping and reporting requirements); *id.* at 888-896 (weighing the substantial obstacle imposed upon women in abusive marriages, who are most affected by the spousal notification provision, against the State's limited interest in protecting the husband's right to be notified of the wife's

abortion procedure—an interest premised in part on outmoded ideals about a "woman's role within the family"). Even prior decisions of this Court applying *Casey* have recognized that balancing is part of the inquiry. *See, e.g., Barnes*, 992 F.2d at 1339-40 (considering the only "slight" burden imposed upon minor women seeking abortion against the government's "undeniable" interest in "protect[ing] children from their own immaturity and naiveté.").

Moreover, if the severity of the burdens imposed has nothing to do with the strength of the reasons for those burdens (*i.e.* absent balancing), then courts would be left to articulate a one-size-fits-all definition of "substantial obstacle" regardless of the weight of the government interests at stake. *Strange I*, 2014 WL 1320158, at *18. Such an approach would engender absurd results completely at odds with *Casey*. If the one-size-fits-all definition of substantial obstacle is set too low (*e.g.*, minor burdens on women), then courts will be instructed to strike down regulations even in the face of compelling health consequences. *Id.* Conversely, if the one-size-fits-all definition of "substantial obstacle" is too high, then essentially all abortion regulation would be permitted, no matter how severe the burdens and how slight the governmental interests at stake. *Id.* While the *Abbott* panel may endorse this view of women's right to access an abortion, *Casey* instructs us that a law need not impose an insurmountable burden or interference in order to be a substantial obstacle. *Id.* Balancing is therefore required to adequately protect both the State's legitimate interest and a woman's constitutional right.

Nevertheless, the panel relies upon *Gonzales v. Carhart*, as compelling this court to apply a deferential rational-basis inquiry,[10] followed by a

---

[10] The *Abbott II* panel misread the *Gonzales* Court's use of the term "rational basis" within the Court's discussion of the "purpose" prong of *Casey*'s undue burden test. To

threadbare consideration of the purpose and effect of the law, each in isolation,

and without reference to important contextual realities in which the law will

---

determine whether the Partial Birth Abortion Act had a lawful purpose, the Court analyzed whether the government had a "rational basis to act" by looking to the Congressional findings and determining whether the Act actually furthered the government's stated purpose for the law. *Gonzales*, 550 U.S. at 158 ("Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn."). Citing only to this "rational basis to act" language in *Gonzales*, the *Abbott II* panel states that "[t]he first-step in the analysis of an abortion regulation, . . . is rational basis review, not empirical basis review." *Abbott II*, 748 F.3d at 596 (citing *Gonzales*, 550 U.S. at 158). The *Abbott II* panel relies upon this phrase in *Gonzales*, taken out of context, to apply a highly deferential, rational-basis review articulated in cases such as *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307 (1993), and *Heller v. Doe*, 509 U.S. 312 (1993)—case law and reasoning which the Supreme Court has never applied to review an abortion regulation. *Id.* at 590. The *Abbott II* panel imports language from these unrelated cases, never cited by the Court in the abortion context, to conclude that the district court erred in finding that the State did not present any "evidence of correlation" between the admitting-privileges regulation and its legitimate interest because, even in the abortion context, "the rational basis test seeks only to determine whether any conceivable rationale exists for an enactment." *Id.* at 594 (citing *F.C.C.*, 508 U.S. at 313). The panel reasons that even "rational speculation unsupported by evidence or empirical data satisfies rational basis review." *Id.* (citation omitted).

A careful reading of *Gonzales* reveals that it faithfully follows the *Casey* undue burden analysis, as discussed *infra*. In *Gonzales*, the Court did not reintroduce the rational-basis standard of review nor change the *Casey* undue burden standard. *Gonzales* used the term "rational" only in explaining why Congress acted with a permissible purpose to ban partial birth abortions. *Gonzales*, 550 U.S. at 158. The *Gonzales* Court reaffirmed that Congress cannot act to impose an undue burden on a woman's right to choose an abortion prior to viability, and the *Gonzales* Court's language cannot be read to transform *Casey*'s undue burden standard into the ordinary rational basis standard that the controlling plurality flatly rejected in *Casey*. As discussed, *Casey* requires a court to analyze the *strength* of the state's justifications and the extent to which those justifications are furthered by the law. A deferential rational basis test has no place in that inquiry.

The *Abbott II* panel, treating the *Gonzales* Court's use of the words "rational basis" as an invitation to apply a run-of-the-mill rational-basis review to H.B. 2, held that by scrutinizing the evidence to conclude that the law lacked a rational basis, the district court applied an erroneous legal standard. The panel concluded that the State's mere offer of conceivably rational justifications for the provision was sufficient to find that the State rationally "acted within its prerogative to regulate the medical profession." *Abbott*, 748 F.3d at 595. Most egregiously, the *Abbott II* panel never considered whether the State's justification was sufficiently weighty to warrant the extent of the burden imposed upon women; instead, it rested on its conclusion that the law had a conceivably rational basis.

operate. Contrary to the panel's understanding of *Gonzales*, the Court in *Gonzales* adhered to the *Casey* undue burden test by expressly considering the extent to which the regulation at issue furthered the underlying government interest vis-à-vis the burden imposed on women by the restriction. In so doing, the *Gonzales* Court, like the *Casey* Court, in fact did weigh the burden against the purported justification, even if the Court did not explicitly use the term "balancing."

The majority opinion in *Gonzales* applied the principles in *Casey*'s undue burden test to determine the validity of the federal Partial-Birth Abortion Act. *Gonzales*, 550 U.S. at 145-46.

> Before viability, a State "may not prohibit any woman from making the ultimate decision to terminate her pregnancy." 505 U.S., at 879. It also may not impose upon this right an undue burden, which exists if a regulation's "purpose or effect is to place a substantial obstacle in the path of the woman seeking an abortion before the fetus attains viability." *Id.* at 878. On the other hand, "[r]egulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Id.* at 877. *Casey*, in short, struck a balance. The balance was central to its holding. We now apply its standard to the cases at bar.

*Id.* at 146. The *Gonzales* majority opinion thus expressly analyzed the Act under the *Casey* standard and stated that the Act would be held

unconstitutional if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability. *Id.*

Critically, the *Gonzales* Court applied and adhered to *Casey* not only in form, *but also* in recognizing that the content of the *Casey* inquiry involves a careful weighing of both burdens and justifications. The Act, as interpreted by the *Gonzales* Court, prohibited only very limited types of abortion practices; the pregnant woman and her physician had an almost unlimited number of abortion procedures, other than the intact D & E method, to choose from.[11] *Id.* at 164. Accordingly, the effect of the law did not place an obstacle in the path of a woman seeking an abortion. But that is not all. In stark contrast to the *Abbott II* panel's approach, the *Gonzales* Court's "effects" calculus considered *more* than just the obstacles imposed by the Act: the Court also expressly considered those obstacles in light of its conclusion that the Act actually furthered the Government's interest in promoting respect for human life. *Id.* at 157-60. Indeed, the Court explicitly observed that the Act's "furtherance of legitimate government interests bears upon," but is not dispositive of, whether the Act has the effect of placing a substantial obstacle on women. *Id.* at 161. Weighing the nearly non-existent burdens imposed upon women's liberty interests, against the fact that the Act actually furthered a legitimate government interest in protecting fetal life, the majority ruled that the law did not impose an undue burden on a woman's right to choose to have an abortion. This is the very balancing that *Casey* requires and that the *Abbott II* panel neglected to do.

---

[11] Thus, in *Gonzales*, the evidence established that the Act would not foreclose the availability of numerous other abortion procedures, whereas the evidence here established that H.B. 2 would foreclose the availability of abortion services for approximately 22,000 in Texas.

Application of the proper balancing test to the evidence adduced at trial reveals that the admitting-privileges provision amounts to an undue burden and is unconstitutional under *Casey* because the substantial obstacles are not outweighed or warranted by the state's purported justifications for the law. As explained *supra*, the evidence established that the admitting-privileges provision will impose an absolute obstacle upon over 22,000 women, and a substantial obstacle on a large fraction of those women restricted by the law— those who must travel vast distances to access the nearest abortion provider. On the other side of the scale, the district court correctly found that the justifications for H.B. 2's admitting-privileges provision is virtually nonexistent because the evidence shows that requiring abortion doctors to have admitting privileges would not increase the competence of those doctors, the safety of abortions, or the quality of hospital care given to the few abortion patients who are treated in hospital emergency care facilities. In light of the heavy burden imposed upon a woman's constitutionally protected right and the weak, if any, justifications for the law, the district court properly concluded that the law amounts to an undue burden on a woman's liberty interest in obtaining an abortion and must be facially invalidated. The enormous flaw in the *Abbott II* panel's spurious undue burden analysis is that it nowhere assesses the strength of the justification that the State names for its legislation, nor does it weigh the weakness of the State's justifications against the extent of the burden imposed upon women. Instead, it simply assumes that the legislation will result in what the State says it is seeking and, as explained directly below, erroneously minimizes the extent of the burden imposed upon women actually restricted by the admitting-privileges provision. The *Abbott* panel's failure to consider the strength of the State's justifications

or to conduct the balancing required by *Casey* alone warrants *en banc* reconsideration.

## B. Panel's Failure to Properly Apply the "Large Fraction" Analysis and Its Disregard of Relevant Real-World Effects

In addition to the *Abbott II* panel's failure to apply *Casey*'s balancing test, it also neglected to apply *Casey*'s "large fraction" analysis and utterly disregarded the context in which the law will take effect as irrelevant—in clear contravention of *Casey*.

First, overturning the district court's injunction of the admitting-privileges provision of H.B. 2, the *Abbott* panel reasoned that

> [t]he evidence presented to the district court demonstrates that if the admitting-privileges regulation burdens abortion access by diminishing the number of doctors who will perform abortions and requiring women to travel farther, the *burden does not fall on the vast majority of Texas women seeking abortions*. Put otherwise, the regulation will not affect a significant (much less "large") fraction of such women[.]

*Abbott II*, 748 F.3d at 600 (emphasis added). Thus, the panel found that because the law would not affect a large fraction of *all women seeking abortions in Texas*, the admitting-privileges provision thus did not impose a substantial obstacle upon a woman's right to seek a previability abortion. *Id.* But this is not what *Casey* requires. Rather, as discussed *supra,* under *Casey*, a court must consider whether the admitting-privileges provision would amount to a substantial obstacle for a large fraction of women who are affected by the abortion restriction in question. *Casey*, 505 U.S. at 897; *see also Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 921 (9th Cir. 2004) ("The relevant 'large fraction' is in turn to be computed with reference only to the

'group for whom the law is a restriction, not the group for whom the law is irrelevant,' *i.e.*, those upon whom a challenged law would have some actual effect, rather than all women[] . . . seeking an abortion.") (*quoting Casey*, 505 U.S. at 894). The record evidence established that clinics throughout Texas will close and that, for example, women in the Rio Grande Valley will be without access to an abortion provider in that region, and women in the "panhandle" of Texas, will be required to travel between 300 and 400 miles in order to access abortion services.[12] Moreover, the evidence showed that approximately one in three, or 22,000, women seeking an abortion in Texas annually will be precluded from doing so as a result of clinic closures and the remaining clinics' inability to meet the increased demand. The evidence further demonstrated that nearly half of women who seek abortions in Texas have incomes below the federal poverty line, and thus will have either substantial barriers to accessing abortion services, or may be completely precluded from obtaining an abortion.[13] Under *Casey*, the proper inquiry then is whether a large fraction of women restricted by the law—*i.e.*, who as a result of the admitting-privileges regulation, are absolutely precluded from obtaining an abortion, as well as those who are forced to travel vast distances and incur prohibitive traveling costs to access abortion services from a provider with the requisite admitting privileges—will face a substantial obstacle. It is *these*

---

[12] As Dr. Potter attested, "[s]ome women in the Panhandle will have to travel more than 350 miles to seek an abortion. The burdens of these trips are magnified by the patchwork of state requirements that may force women to make multiple trips to a clinic. Some women who would otherwise have gotten an abortion will be prevented from doing so by these burdens."

[13] Angela Martinez explained that most of Planned Parenthood Women's Health Center's clients are parents below the federal poverty line who "often have trouble obtaining use of a car and the resources to pay for gas, permission from their employer to take the necessary time off, and/or childcare."

*women* affected and burdened by the enactment of the admitting-privileges provision that should have served as the "denominator" for purposes of the large-fraction analysis—not, as the *Abbott II* panel erroneously reasoned, *all women* in Texas seeking an abortion. *Casey*, 505 U.S. at 894. The panel's articulated calculus is improper under *Casey*.

Second, the panel failed to follow *Casey* when it rejected relevant evidence regarding the effect the law will have in Texas, in light of the social context of the law, such as local hostility towards abortion providers. For example, the *Abbott* panel discounted the evidence adduced at trial that abortion providers in Texas will have difficulty complying with H.B. 2's admitting-privileges regulation, reasoning that the "challenges [faced by doctors seeking admitting privileges] were almost entirely unrelated to H.B. 2." *Abbott II,* 748 F.3d at 599 (reasoning that clinics' difficulties in hiring physicians with local hospital admitting privileges based on "the terms of [the physicians'] existing employment . . . [or] fear[] [of] anti-abortion violence[,] . . . is [not] connected with H.B. 2."). The *Abbott II* panel viewed this evidence as inapposite to the undue burden analysis because it reflected only that "many factors other than the hospital-admitting-privileges requirement affected abortion access" and did not reflect the direct impact of H.B. 2 itself. *Id.* at 599 (citing *Abbott*, 734 F.3d at 415). Contrary to the *Abbott II* panel's analysis, the inquiry under *Casey* requires us to look at exactly this sort of contextual evidence that the *Abbott II* panel rejected to determine whether the effect of the law is to create a substantial obstacle in the path of women's access to abortions, in light of the social context in which the law will be enacted. Rather than consider the real-world, context-specific effect of H.B. 2, the *Abbott II* panel looked at H.B. 2's admitting-privileges provision in a vacuum, and

thereby disregarded *Casey*'s mandate to consider the relevant circumstances that impact a woman's access to abortion services. *Casey*, 550 U.S. at 897; *see also Planned Parenthood Se., Inc. v. Strange*, No. 2:13-CV-405-MHT, 2014 WL 3809403, at *26 (M.D. Ala. Aug. 4, 2014) (hereinafter "*Strange II*") (reasoning that the *Abbott II* panel erred in declining to consider the "obstacles that arise from the interactions of regulation with women's financial constraints, as well as other aspects of women's circumstances, as ineligible to be 'substantial obstacles' under *Casey*" because "[i]n *Casey* itself, the Supreme Court found that a spousal-notification requirement was an undue burden because of its effect on women who were in abusive relationships [and] [t]he circumstances of those women and their relationships were at the core of the *Casey* analysis. *Casey*'s treatment of the spousal-notification requirement shows that the *interaction of the state regulation and existing social conditions* can create an obstacle for women.") (emphasis added).

Applying the *Casey* undue burden standard to the factual findings by the district court that are supported by the record evidence, it is clear that a large fraction of women affected by the admitting-privileges restriction will face substantial obstacles in seeking abortions. Properly considered, the Plaintiffs' evidence established the real-world effect of H.B. 2—that many clinics will close because Texas abortion providers will be unable to comply with the admitting-privileges provision; that the Rio Grande Valley, for example, will be without an abortion provider; and that the few remaining clinics throughout Texas will be unable to meet the significantly increased demand for abortion services, thereby precluding approximately one in three women seeking abortions in Texas, or 22,000 women, from accessing abortion services as a

result of the decrease in available clinic providers alone.[14] Further, the evidence established that women in the Rio Grande Valley and West Texas will be required to travel vast distances to secure access to abortion, and that forty percent of women seeking abortions in Texas are at or below the federal poverty line, and thus are unable to travel the distances that will be necessary as a result of various clinic closures.

Under *Casey*, the large-fraction analysis requires courts to examine the effects on women actually restricted by the law: here, not only the 22,000 women completely deprived of abortion services as a result of clinic closures and overall reduction in capacity of abortion providers in Texas, but also the women who will only be able to access abortion services by overcoming the severe, extra burden of traveling hundreds of miles to obtain a legal abortion from a physician with the requisite admitting privileges. *Casey*, 505 U.S. at 894.[15] With feeble justification for so doing, the State is now not only

---

[14] The *Abbott II* panel reasoned that Planned Parenthood cannot "resurrect its assertion that one-third of the state's clinics will close or over 22,000 women will be deprived of access to abortion services each year because the district court also refused to accept these findings." *Abbott II*, 748 F.3d at 598. As discussed, while the district court's factual findings, written into an opinion issued the day before the admitting-privileges provision was set to go into effect, did not address many of the details adduced at trial, the court expressly stated that it was relying upon all admissible evidence—including the evidence contained in both parties' sworn declarations. *See Abbott,* 951 F. Supp. 2d at 896 n.3. Accordingly, the panel read too much into the district court's failure to specifically recite the detailed evidence presented at trial that supported the district court's explicit findings. Such neglect to include these details, among others, does not reflect a "refusal to accept" the relevant evidence, but rather, a time-constrained effort to grant the Plaintiffs' relief before the unconstitutional law went into effect.

[15] Even if we assume incorrectly, as the *Abbott II* panel did, that the proper denominator for the *Casey* large-fraction analysis is comprised of all Texas women seeking an abortion, or approximately 68,000 women annually, the evidence nonetheless established that a large fraction of women—22,000 women throughout Texas, or one in three Texas women seeking an abortion—will be absolutely precluded from accessing abortion services as a result of H.B. 2's admitting-privileges provision. Thus, even utilizing *arguendo* an improper denominator and also disregarding, as the *Abbott II* panel erroneously did, the social context

precluding one third of women from accessing an abortion provider altogether—because, as a result of the admitting-privileges provision, clinics will indefinitely close and the remaining clinics will be unable to meet the significantly increased demand placed upon their facilities—but also, forcing women who reside in, for example, the Rio Grande Valley and the western panhandle, to travel vast distances. Assuming these women who reside great distances from an abortion clinic are actually able to obtain an appointment at an over-booked facility, they must additionally overcome the burden of travelling hundreds of miles to keep their appointment. A significant number of these women may be unable to do so because of their particular life circumstances, such as poverty, inability to access travel accommodations, difficultly obtaining child care, or inability to take time off from work or other duties. The evidence established that these barriers amount to substantial obstacles in the path of a woman seeking a legal abortion—not merely incidental inconveniences. Indeed, the record demonstrated that forty percent of women seeking abortions in Texas are below the federal poverty line and thus will likely be unable to secure transportation to the closest abortion provider. For these women, the admitting-privileges provision "does not

---

and real-world barriers to access, such as poverty, the evidence established that a large fraction—one third of women seeking abortions in Texas annually—will be unable to access abortion services as a result of the overwhelmed capacity of the few remaining clinics in Texas.

To be sure, the Court has never indicated that a "large fraction" must be an absolute majority of the women actually affected by the law. Had the Court meant to require proof that a *majority* rather than a fraction of women actually affected by the law will face substantial obstacles, it would have so held. Instead, in its analysis of the challenged spousal notification provision, the *Casey* Court found that although the vast majority of women volunteered to inform their husbands of their intent to procure an abortion, within the one percent of women who declined to share this information with their spouses, a large fraction of those women would face a substantial obstacle. *Casey*, 505. U.S. at 894-97. The Court so held without articulating how many women within that one percent would be so burdened.

merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle. We must not blind ourselves to the fact that the significant number of women who [cannot travel outside of the Rio Grande Valley, or their relevant region, because of barriers caused by poverty] are likely to be deterred from procuring an abortion as surely as if the [State] had outlawed abortion in all cases." *Casey*, 505 U.S. at 893-94. Thus, applying *Casey* properly, the record shows that H.B. 2 imposes a substantial obstacle on a large fraction of women actually restricted by the law.

Additionally, in reversing the district court's decision, the *Abbott* panel made the sweeping conclusion that *Casey* "counsels against" finding that "potential" travel burdens amount to a substantial obstacle because the *Casey* Court upheld the 24-hour informed consent provision despite noting the additional travel that women would be required to endure as a result of the provision. *Abbott II*, 748 F.3d at 598. But an examination of *Casey* reveals that the panel's conclusion on this score is wrong. As an initial matter, the *Abbott II* panel altogether neglects to note that the *Casey* Court explicitly limited its holding to the record evidence in that case. *Casey*, 505 U.S. at 901 (acknowledging that "some amount of increased cost could become a substantial obstacle, [but] there is no such showing *on the record before us.*") (emphasis added).

But there is more. The facts of *Casey* were substantially and meaningfully distinguishable from the instant case: in particular, the women affected by the 24-hour notice provision in *Casey* were *already* required to travel significant distances to obtain an abortion; at most, the provision required those women to make the same trip twice. *Id.* at 886-87; *Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1351-52 (E.D. Pa. 1990). By

contrast, the clinic closures caused by H.B. 2's admitting-privileges provision imposes significant *new* burdens on women by requiring them to travel significant distances for the very first time. *Accord Strange II*, 2014 WL 3809403, at \*28 ("The women at issue in . . . *Casey* were like the rural woman described above: before the waiting-period provision, they *already* had to, and were able to, make a two-to-three-hour trip to a clinic. The new provision simply required them to make that trip twice or to stay overnight. By contrast, as discussed above, the clinic closures in this case would impose severe *new* burdens on the urban woman."). Furthermore, in *Casey* the Court, characterizing its conclusion as a "close[] question," weighed this burden of additional travel time against the State's legitimate interest to "facilitate[] the wise exercise of" a woman's right to choose to have a previability abortion, and concluded that the burden was not undue. *Casey*, 505 U.S. at 886-87. Comparatively, the *Abbott II* panel neglected to weigh the strength of the State's interest against the burden imposed by additional travel time and, instead, erroneously pronounced that *Casey* counsels against finding that 150 miles of additional travel is a substantial obstacle in every challenge to an abortion regulation. The panel thus erred in interpreting this record-tethered ruling in *Casey* to stand for the consequential legal rule that increased distances are categorically insufficient to constitute a substantial obstacle. *See, e.g.*, *Strange II*, 2014 WL 3809403, at \*29 ("Courts, like the *Abbott* courts, err when they seek to transform [a] factual conclusion into a simplistic legal rule. As this case demonstrates, in assessing the burdens imposed by a regulation, the factual details are critical.").

Moreover, by diminishing the significance of traveling 150 miles to obtain an abortion, the panel seems to imply that burdens which are

surmountable for some women categorically do not amount to an undue burden. Nowhere in *Casey* or *Gonzales* does the Court suggest that the burden imposed upon women must be *insurmountable* in order to be undue. This troubling suggestion that a burden is not undue if women can overcome it, despite any hurdles they must jump over in order to do so, would flout the Supreme Court's continued reaffirmation of the liberty right recognized in *Roe*, and upheld in *Casey* and *Gonzales*. Merely because some women, particularly those with financial resources and familial support, will undoubtedly be able to overcome the substantial obstacles that H.B. 2 has placed in their path, does not somehow render an otherwise unconstitutional provision lawful—stated simply, overcoming a burden does not mean the burden is not *undue*.[16] We cannot look at women's ability to overcome an obstacle in isolation and use that predicted ability to overcome barriers to somehow conclude that the obstacle is not substantial or undue.

The Supreme Court has never indicated, either in the abortion context or in other similar contexts, that an ability to overcome an obstacle caused by a regulation is fatal to the plaintiff's constitutional challenge to that regulation. For example, in *Anderson v. Celebrezze*, the Court struck down an Ohio regulation that precluded independent candidates from running for the Presidential election if they did not submit a statement of candidacy and a nominating petition by March 20th, for the November election. 460 U.S. 780, 782-83 (1983). The Court struck down the law because, on balance, the State's interest in regulating the election process by enforcing a strict deadline was

---

[16] Indeed, "[a] woman with means, the freedom and ability to travel, and the desire to obtain an abortion, will always be able to obtain one, in Texas or elsewhere. However, *Roe*'s essential holding guarantees to all women, not just those of means, the right to a previability abortion." *Lakey*, 2014 WL 4346480, at *13.

"minimal" in comparison to the extent and nature of the burden placed on voters' "freedom of choice and freedom of association." *Id.* at 806. As Chief Justice Rehnquist noted in dissent, the "record shows that in 1980 five independent candidates submitted nominating petitions with the necessary 5,000 signatures by the March 20 deadline and thus qualified for the general election ballot in Ohio." *Id.* at 809 (Rehnquist, J., dissenting). Thus, we know that some candidates were able to overcome the obstacle imposed by the restriction. This fact did not impact the Court's decision to conclude that in light of the State's weak interest, the burden imposed upon independent candidates and their supporters was unconstitutional.

Just as the evidence of individual candidates overcoming the unconstitutional restrictions in *Anderson* was not dispositive in the Court's analysis, I fail to see how women's potential success in struggling to overcome a substantial obstacle imposed by a regulation that does not actually further the State's purported interest is relevant. The *Casey* Court reaffirmed *Roe*'s central principles and articulated a middle-of-the-road standard between strict scrutiny and rational-basis review in order to reconcile a woman's liberty interest in choosing to obtain an abortion with the state's legitimate interests in protecting women's health and promoting fetal life. The *Abbott II* panel's interpretation of the undue burden standard implies that a state may all but prohibit abortions. That is simply not the *Casey* undue burden standard and such an approach threatens to eviscerate the careful balance that lies at the heart of *Casey*. *Gonzales*, 550 U.S. at 146 (explaining that *Casey* "struck a balance. The balance was central" to the *Casey* Court's holding).

Lastly, the *Abbott II* panel looked only to the evidence that women in the Rio Grande Valley would be required to travel an additional 150 miles or less

65

to access an abortion outside of the region, and altogether ignored evidence regarding the distances traveled by women in West Texas and the panhandle. *Id.* However, even if we confine our view of the evidence to the effect on women in the Rio Grande Valley, the record indicates not merely an inconvenient increase in travel, but a corresponding inability of women seeking abortions living in that area to actually travel the increased distance because of prohibitive costs and burdensome arrangements that would be necessary to make before traveling to the abortion provider. As discussed *supra*, *Casey* dictates that this court focus its inquiry on these very women who are most restricted by the admitting-privileges provision. *Casey*, 505 U.S. at 894.

Upon weighing the heavy burden imposed on a large fraction of women affected by the admitting-privileges provision against the State's weak justifications that are unsupported by reliable evidence, it becomes clear that this court should reconsider this case *en banc* and affirm the district court's conclusion that H.B. 2's admitting-privileges provision imposes an undue burden upon a woman seeking to obtain a previability abortion and thus is unconstitutional.

## IV. Conclusion

This court's charge is clear: "The woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade.* It is a rule of law and a component of liberty we cannot renounce." *Casey*, 505 U.S. at 870. In *Casey*, the Court articulated a framework that this court is bound to follow to ensure that a woman's substantive due process right to choose to have a previability abortion is protected, while allowing the State to promote its legitimate interests in protecting women's health and promoting fetal life. The undue burden test that *Casey* announced strikes this careful balance

between the competing interests and must be applied in challenges to abortion regulations, like H.B. 2's admitting-privileges requirement. The *Abbott II* panel failed to properly apply this standard, thereby threatening to annihilate the constitutional protections afforded women under *Roe* and explicitly reaffirmed in *Casey*. The *Abbott II* panel's opinion will invariably affect the outcome of future challenges (some of which are currently pending before this court) to abortion regulations. For these reasons, I dissent from the denial of rehearing *en banc*.